## PRUDENTIAL INS. CO. OF AMERICA v. BACIOCCO.*

Circuit Court of Appeals, Ninth Circuit. January 14, 1929.

No. 5563.

F. Eldred Boland, and Knight, Boland & Christin, and J. W. Radil, all of San Francisco, Cal., for appellant.

I. F. Chapman, of San Francisco, Cal., for appellee.

Before GILBERT and DIETRICH, Circuit Judges, and NORCROSS, District Judge.

DIETRICH, Circuit Judge. This is an action upon a policy of insurance issued by the appellant company upon the life of one Arnold A. Ertola, with the appellee named as beneficiary. The policy provides for the payment to the beneficiary of $5,000 upon the death of the insured, and for an additional $5,000 in case death occurs "as a result, directly or independently of all other causes, of bodily injuries, effected solely through external, violent, and accidental means." The policy also contains a provision to the effect that, in case of death by suicide within a year from its issuance, the liability of the insurer shall not exceed the amount of the premiums paid. The insured came to his death by violent means on April 18, 1926, within a year from the date of the policy. The simple issue therefore was whether his death was voluntary or involuntary, and here the only question is whether plaintiff discharged the burden of proving that it was accidental or involuntary. The issue was tried by the court, waiver of a jury having been duly stipulated.

Appellee and the deceased were business partners in San Francisco, and on May 8, 1925, each took out a life policy of the same kind and for the same amount, and each

*Rehearing denied February 11, 1929.

named the other as beneficiary. The premiums were paid out of the partnership funds, and it was apparently the purpose of each partner to protect the other against business loss in case of death.

Ertola was 29 years old and had a wife and two children. The court found that he was an industrious, temperate man; but, as bearing on motive for suicide, the appellant adduced evidence tending to show that for some time prior to his death he had maintained unduly intimate relations with a woman other than his wife and that he was in a measure responsible for the dissipation of the assets of the business in which he and appellee were engaged. His death occurred on a Saturday night or early Sunday morning. On the preceding Wednesday his "girl friend," with her brother and sister, went on a vacation to Ukiah, in an automobile which he had rented and authorized the garage to let them have. He went by train the following day, and all four were in and about Ukiah until Saturday, when they all came back to San Francisco in the automobile, arriving about 7 o'clock in the evening. He and the girl had dinner together at a restaurant, and after dinner they drove around the city and down the peninsula until about 12:30 in the morning, when he took her home and left in the automobile. The girl testified that when he left her at that hour he had not been drinking, nor did he appear to be uncommonly melancholy. He did not say where he intended to go, but she took it for granted that he was going home. Where and how he spent the time thereafter up to about 2 o'clock is not known, but at that hour he turned the car in at the garage, and talked about 15 minutes with the garage owner. The latter testified that he seemed to be sober and in every way rational. No one thereafter saw him alive. At 8:30 Sunday morning his body was found several miles away, lying in a cleft of rocks on the beach below the Cliff House, where it apparently had been cast by the sea. The body was fully dressed and the hat was near by. One of the hip pockets "looked like it had been pulled out or had been emptied." On finding the body, the life guards were under the necessity of hoisting it about 25 feet and may have dragged it against the rocks. The nose was fractured and there was a slight laceration over one of the eyes. The surgeon who made the autopsy was of the opinion that death was from drowning. The Cliff House stands on a point of rocks at a considerable elevation above the ocean. By it runs a highway, and between the highway and the cliff a sidewalk, along the ocean side of which is a solid wall approximately four feet high. The cleft of rocks where the body was found is toward the sea from this walk and wall.

It is not controverted that death by drowning is a death by external and violent means within the terms of the policy, nor is it questioned that in cases of this character where such a death is shown there is a presumption against the theory of suicide. Metropolitan Life Ins. Co. v. Broyer (C. C. A.) 20 F.(2d) 818. It is also conceded that by reason of this presumption appellant had the burden of proving the contrary, and that where, as here, evidence of self-destruction is circumstantial, the insurance company must fail "unless the circumstances exclude with reasonable certainty any hypothesis of death by accident, or by the act of another." Tabor v. Mutual Life Ins. Co. (C. C. A.) 13 F.(2d) 765, 769.

We cannot say that the court below erred in holding that the circumstances fail to measure up to this requirement. Without incorporating practically all of the testimony, we cannot refer to the many little details disclosed by the record as having some bearing for or against the theory of suicide. Appellant's argument is based largely, if not entirely, upon the assumption that the insured must have gone to his death from the wall. Even so, he might have fallen from a sitting or reclining position on its top. But aside from that possibility, the evidence is not at all conclusive that the body went to the water from the wall. One of the life guards testified that "the body had the appearance that it had been washed in there (the cleft or crib of rocks where it was found) by the waves. It was just lying free. * * * The surf was rough and the body could have been washed from the rocks and into there. * * * The surf was rough that night at high water." He further stated that if one walks into the water along the beach near that point and is drowned, the body usually floats out to sea or north along the cliffs and is lost.

From a consideration of the entire record, we are of the opinion that the manner of the insured's death is an unsolved mystery, and that we would not be warranted in disturbing the finding of the lower court.

The judgment is therefore affirmed.