**The CANADA LIFE ASSURANCE COMPANY, a corporation, Appellant,**

v.

**Charlotte S. HOUSTON, Appellee.**

**No. 15192.**

United States Court of Appeals
Ninth Circuit.

Feb. 12, 1957.

---

Francis V. Keesling, Jr., Henry C. Clausen and Henry C. Clausen, Jr., San Francisco, Cal., for appellant.

Angell & Adams, San Francisco, Cal., for appellee.

Before HEALY, LEMMON, and FEE, Circuit Judges.

LEMMON, Circuit Judge.

1. *Statement of the Case*

This action to collect the proceeds of a life insurance policy was commenced by the appellee against the appellant in the Superior Court of Alameda County, California, on January 4, 1955. On petition of the appellant, the suit was removed to the Court below. The case was tried without a jury before Chief Judge Roche, whose Memorandum Opinion is reported in 137 F.Supp. 583.

The Court below awarded the appellee a judgment for $28,552, with interest at 7% from May 4, 1954, the date on which the proof of loss and claim were filed with the appellant.

From that judgment, which was signed on February 8, 1956, an appeal was taken on March 6, 1956.

2. *Statement of Facts*

On September 24, 1953, William Mark Houston, United States manager for three insurance companies, of which the New Zealand Insurance Company was the "prime employer", made written application for a $10,000 life insurance policy, subject to a "family income" provision. The policy was issued on November 3, 1953, at which time Houston was a resident of Berkeley, California.

Houston's application stated that he used "alcoholic stimulants" "socially only occasionally", and to the question, "Have you ever used them to excess?" his written answer was "No". The appellant asserts that these two answers were "material misrepresentations".

The policy contained the following paragraph:

"Suicide. During the first two years from the date of issue of this policy, suicide (whether the assured be sane or insane) is a risk not assumed under this policy; should death occur in such manner that the assurance is not effective because of the operation of this provision, the Company will pay an amount equal to the premiums paid under this policy, which amount will be paid in one sum to the person or persons who would have been entitled to the net proceeds of this policy or the first payment therefrom had this policy matured by reason of the assured's death."

Houston and the appellee had been married for twenty-five and a half years. His widow, who remarried on July 9, 1955, testified that "It was a very happy marriage". There were two daughters, Charlotte, 26, and Ann, 22.

On Monday, February 22, 1954, Houston died as a result of a gunshot wound suffered by him in the basement of his Berkeley home.

On the Friday before Houston met his death, he worked in his office in San Francisco, leaving there at about six o'clock. His manner that day was not different from "any other day", according to his secretary.

The following day he attended a party at his daughters' sorority house, and appeared to enjoy himself. The next day, Sunday, he went to church, and afterwards went to Lafayette to make plans for his ranches in Oregon with his two partners. At that conference "He was still very cheerful".

Sunday night Mr. and Mrs. Houston and their daughter Ann "went to dinner with the Hanscoms, * * * friends of long standing", to whose son Ronald Ann was engaged. On that occasion "he was his usual jovial self", exchanging neckties with his host. The Houstons left the Hanscoms at about 11 o'clock, and returned directly to their own home. At the Hanscom gathering, Houston had "two drinks before dinner * * * None after."

We now come to the day of Houston's death. Since Monday was Washington's birthday, in accordance with the holiday custom in the Houston household the family slept late. Mrs. Houston and Ann had gotten up at about 9:30 in the morning, but it was between 1 and 1:30 in the afternoon before Mrs. Houston went upstairs and awoke her husband. At that time, he still seemed "congenial and happy". Mrs. Houston put a glass of tomato juice for him "on the top of the stairway, the floor of the upstairs hall".

Mrs. Houston went back into the kitchen, to finish cooking breakfast for Houston and brunch for herself and Ann.

Ann was nailing a shelf in the hall outside of the kitchen. As she was putting the hammer and nails away, "Daddy came downstairs into the kitchen, and I was singing, 'Oh, What a Beautiful Morning!'" Her father, with his minutes numbered, went up to her, gave her "a good morning peck on the forehead, and said it certainly was a beautiful morning".

Ann told her father that they were going to have steak for breakfast. "And he said that sounded wonderful."

Houston was dressed in his bathrobe, pajamas, and leather slippers. He was not wearing his tri-focal glasses, although he "usually wore them all the time".

Ann testified that her father looked "happy and smiling". She left him to go to the living room to speak to her grandmother, while Houston went down to the basement.

The daughter's testimony continued:

"Then I heard a bam!—and I came back into the hall because I thought my shelf had fallen, and I called to Mother and I didn't get an answer".

In the meanwhile, Mrs. Houston, who had heard, not a "bam!" but "a heavy thud", went down alone into the basement, and "saw Mr. Houston lying there". She was the first to reach him. She called upstairs to her daughter, "Ann, as quickly as possible, call the ambulance."

"Then I ran downstairs into the basement and saw Daddy," Ann testified.

The shooting occurred in a narrow passageway at the rear of the basement, at a point directly beneath the living room. This section of the basement was raised about 14 inches from the main level. Houston was a tall man—6'2½"—and it was therefore necessary for him to stoop in the passageway area where the shooting occurred. The passageway area led through many stored items, such as a sofa, patio chairs, a cedar chest, sleeping bags, air mattresses, a garden trellis, some bedboards, and the like. Some of these items protruded into the hallway. The distance from the floor to the ceiling in the passageway was less than 5'11", because a police officer of that height "couldn't stand up in the area without bending over". The "light was off" in the basement when Mrs. Houston found her husband's body.

The death gun was an 1894 Winchester, .30 caliber, WPCP lever action repeater. There was "only the one exploded cartridge in it, no others".

The body was lying face down, both hands underneath. The bullet had entered in "the chest area at the front", and had come out "in the area of the shoulder blades, to the rear, the bottom of the shoulder blade area." In a bookcase in the basement there was a Manila paper sack containing two different kinds of cartridges, one of which would fit the death gun. The bag of shells was closed when the police found it. "I had opened it to look in," one officer testified.

There was an area around the "entry hole" in the chest, where "both the clothing remaining over the wound and the skin itself showed evidence of blackening from the blast." According to a police officer, that indicated that the muzzle of the gun was "Either pressing against it or extremely close, enough so that it had the same effect as if were against the body or clothing." According to one of the expert witnesses offered by the appellee, however, if a gun is right against the body, "There usually is no burn at all; the only thing that is made in that case is a dark ring around the edge of the hole when the bullet enters."

After passing through Houston's body, the bullet went through the ceiling at a slight angle, entered the back of a chair in the living room above, and lodged under the upholstery near the top of the chair. Some effort was made to get the bullet out, "but it would have required moving the upholstery from the chair, and eventually we left the bullet in place."

In support of her accident theory, which, under the policy, must be accepted if she is to recover, the appellee points out that:

It was found possible to discharge the gun by striking the hammer spur when the hammer was down on the firing pin. When so adjusted, it could also be discharged "by striking it on the butt on the floor". The lever action was quite loose and tended to open very readily. Upon opening, it would be in a position to cock and load, by closing the lever,

perhaps without the realization of the person doing it. When the lever mechanism was opened, the trigger was exposed. The gun was found to have a trigger pull of between $4\frac{1}{2}$ and 5 pounds.

The appellant, on the other hand, maintains that it was a case of suicide, asserting that:

The dent in the floor board was one thirty-third of an inch deep. It was similar to the recoil marks made when the gun was fired after the event by pulling the trigger while resting the gun butt on the floor board.

At the time of the shooting the decedent had bent his body over the gun until his fingers were accessible to squeeze or push down upon the trigger, and his chest-heart area was within an inch of the gun muzzle. The muzzle was three feet from the floor, which in turn was about five feet eleven inches from the ceiling. His torso had had to be a little more than horizontal to the floor.

The entry wound was a power-blasted hole at the heart area. The path of the bullet, as shown from the fact that the gun was thus positioned at a near vertical, the body bent over, the muzzle within an inch of the power-blasted heart area of the chest, was through the body, out a smaller hole in the back and at a point lower down than the front entry wound, and up to the ceiling almost vertically overhead.

There was no evidence of any kind that the gun had made contact with any object other than the floor. The only evidence relevant to the question of whether the firing had been by an accidental jarring of the gun against some object was the testimony of a gun expert in his description of the gun and the passageway. He testified that the passageway was crowded with protruding furniture when he investigated the basement "two months after the accident", (actually it was less than one month) but that even so one could walk through the passageway. In any event,

he testified that striking the butt of the rifle on its sides did not discharge the gun.

There was no evidence of physical facts to indicate that Houston had accidentally pushed down upon the trigger. There was testimony that Houston was careful with guns, and, though his habit was to keep the guns loaded, it was with cartridges only in the magazine, not in the chamber. The gun's half-cocked position was referred to as the "only safety mechanism", and the appellee's own witness testified that it was in good order.

Thus runs the appellant's argument.

The appellee's two experts testified, over the appellant's objection, that the results of their tests and examination of the gun disclosed that it could be fired by means other than by intentionally pulling the trigger; in other words, that it could be fired accidentally.

One, a criminologist, stated that he succeeded in causing "the round in the barrel" to discharge while the hammer rested against the firing pin, once by dropping the rifle butt first upon the floor and once by hitting the hammer spur with a hammer.

The appellant's investigation of the death carried it to Lakeview, Oregon, where it is claimed that evidence was unearthed as to possible hidden motives for "feelings of remorse and suicide", and also evidence of misrepresentation in the application for insurance.

In October, 1953, about a month after Houston had applied for the policy in suit, he was involved in an accident with his company-owned Cadillac. The accident occurred while he was en route southbound between Lakeview and Northern California.

The morning after the accident Houston telephoned his casualty superintendent to "take care" of the collision damage to the automobile, which was self-insured by the New Zealand company. The casualty superintendent, *infra*, reported "the liability feature of the case to the" London Guarantee & Accident Company. Thomas McNally, the assistant claims superintendent of the latter company and the casualty superintendent of Houston's company "jointly assigned the investigation to an adjuster at Klamath Falls," Oregon, J. W. Van Doren. Van Doren's report was stricken from evidence on the appellee's motion.

The report told of an accident that occurred in the early hours of October 19, 1953. Houston had been in Lakeview for some time, staying at one of his ranches. He had invited Alton F. Irby, Jr., of Atlanta, to visit him and enjoy some bird hunting.

They went into the bar of Hunter's Motel on the night of October 18, 1953, and there met, allegedly for the first time, a colorful divorcee of Navarro, California.

After one drink at that bar, they decided to drive to Alturas, California, about 56 miles from Lakewood, where they could attend a dance and would find bars open until 2 a. m. The trio started out in the Cadillac sedan, and after getting to a point in an area in Southern Oregon known as Chimney Rocks, 11 miles north of Alturas, they met with an accident.

Houston, who admitted that he was traveling 60 or 65 miles an hour, was confronted with several deer crossing the highway in front of him. In trying to avoid hitting them, he struck a flimsy barricade and apparently swerved his car out of control, going into an area between a new roadbed and the old highway. Houston felt sure that the car did not overturn, "but that it was tipping badly from side to side."

Apparently Houston was thrown from the car, but it was Van Doren's understanding that Irby and the vivacious woman rode with the car until it stopped. Later, the woman was lying "on the floorboards under the dash." The trio were returned to Lakeview, and she was taken to Dr. W. P. Wilbur for examination. He wanted to hospitalize her at the Lakeview Hospital, but she

refused to submit to this treatment, feeling that she would be better off in a room at Hunter's Motel. "Mr. Houston and Mr. Irby were very solicitous for her welfare and did everything possible to provide for her comfort, probably going somewhat beyond the bounds of ordinary care and attention that one generally finds in a situation following an accident". Van Doren reported that "we were able to secure her signature" to a "release for $1,050 * * * $1,000 to cover loss of wages, plus $50 for the transportation expense to get back to Los Angeles".

The report, with notable restraint, described this divorcee as a "young lady of rather doubtful character and background". The description of her given by Virginia Wilkerson, who testified that she was a close friend of Houston, was not so restrained, as we shall see in a moment.

Mrs. Wilkerson's testimony was introduced in the form of a deposition, taken in Lakeview, as part of the appellant's case. She conceded that she considered herself "hostile" to the defense of suicide urged by the appellant.

She testified that she had known Houston for about ten years, during which time she had seen him probably four or five times each year; that he drank at her home; that "He took a lot of pills"; that he mixed Scotch with milk, saying "The Scotch is for me, and the milk is for my ulcer". She described him as "egotistical" and "selfish", and said that he once fired a gun in her father's office. Houston was "a lot quieter" when Mrs. Houston was with him than when he came alone. When he came alone, he "would be under the influence of alcohol a great deal of the time."

Mrs. Wilkerson testified that Houston told her three different stories of the accident.

One version was that he was alone. The second was that he was with Irby and a girl. The third was that he was just with the girl. The girl was a "prostitute" and had purple hair. The witness added that Houston told her that he had "handed" the divorcee a thousand dollars.

Mrs. Wilkerson testified that there was a difference between Houston's demeanor in San Francisco and his demeanor in Lakeview:

"Here he was 'Wild Bill,' and there he was manager for the New Zealand Insurance Company."

When he was in Lakeview without Mrs. Houston, the decedent had about eight highballs—presumably at one sitting, although the witness did not so specify.

Jean Pearson, a Lakeview head waitress, deposed that she had seen Houston wearing a coonskin cap. In October, 1953, she observed his demeanor two or three times in the cafe where she worked, saw that he was intoxicated, overbearing, and unruly, acting like a "big shot".

On the other hand, there was considerable testimony that Houston did not use alcoholic stimulants to excess. Many witnesses, some of them called by the appellant itself, testified that they had never known Houston to be intoxicated, or under the influence of liquor, or without full possession of all his mental and physical faculties.

Heading the parade were two fellow-employees of the decedent, Richard Benfield Masters, Houston's assistant, and Paul W. Youngers, casualty superintendent of the company, who handled litigated claims, adjustment of claims, underwriting, and production.

Masters, who had known Houston since May, 1952, testified that he had never seen the decedent "drunk, never seen him to the point where he had lost his ability to handle himself".

Youngers said that he had never seen Houston so under the influence of alcohol that, in the witness's opinion, "he was not able to do his work, could not talk intelligently and coherently".

Houston's widow said on the stand that she never saw her "husband intoxicated, unable to drive, unable to talk

or to conduct himself as a gentleman—not once."

His daughter Ann testified that in all the years she lived with her father, all the trips she took with him, she never saw him intoxicated, never saw him drink so much that he was unable to drive his automobile, or that he staggered, or walked with uncertainty, or was incoherent or not wholly rational.

His daughter Charlotte testified to the same effect, and replied in the negative to a question as to whether she had ever heard her mother or her sister complain to her father about his drinking, or as to whether she herself had any reason so to complain.

Leroy Hanscom, Ann's father-in-law, who had known Houston six or seven years, said that he had never seen his friend "where—even when he [had] had a drink or two—* * * it seemed to make a particle of difference to him."

Similar testimony was given by Donald C. Campbell, an employee of the Department of Agriculture at the University of California, who had known Houston since 1947, and regarded him "as a father". Campbell said:

"[Houston] would have a drink with everybody else and along with everybody else, but by no means, he was not an alcoholic by any way that you could picture him. He was —he just was a social—would drink right along with the crowd and very —and up to a certain point, and he would cut off."

Other witnesses to the decedent's moderation vis-à-vis alcohol were Bert W. Levit, a San Francisco attorney; Ellen May Hoffman, Houston's "personal confidential secretary" for more than ten years; Harry A. Utley, a 72-year-old real estate and insurance man of Lakeview, who was associated with Houston in the ranch business; Evans M. Taylor, San Francisco attorney, and Gilbert Wilkes, secretary-treasurer of the Mutual Stevedoring Company of San Francisco, both of whom were also associated -with Houston in ranching; and Char-

lotte's husband, Roger Gustafson, who was in the "production control" business with United Centrifugal Pump.

### 3. The Appellant's Contentions

Besides urging its principal contention, *supra*,—that Houston committed suicide and that therefore the beneficiary is not entitled to collect on the policy—the appellant company specifies the following errors:

1. The admission of the testimony of the appellee's experts, Lowell Bradford and Dr. Paul L. Kirk, regarding the results of gun-firing experiments, *supra*.

2. The exclusion of the written report of the adjuster, Van Doren, *supra*, regarding the escapade at Lakeview.

3. The exclusion of the appellant's hypothetical question, addressed to Dr. A. E. Bennett, a Berkeley neurologist and psychiatrist.

4. The exclusion of evidence of the circumstances surrounding the making of the coroner's jury's verdict and the exclusion of opinion evidence from the coroner and police officers "to rebut the verdict and the opinions of respondent's experts".

5. Finding that the decedent made no false representations in the application for insurance, that he did not know that any of the statements therein were untrue, that his use of alcohol was not excessive or unusual, and that his statements were not material misrepresentations.

6. Exclusion of evidence of the appellant's underwriting practices regarding drinking habits, and evidence of whether the appellant, in the light of such practices and with the knowledge of the decedent's drinking habits, would have issued the policy in suit.

7. The ruling that interest was due from May 4, 1954, upon the amount of the commuted value.

### 4. The Appellee's Points

1. The trial court's finding that the insured's death was not the result of suicide is amply supported by the evidence.

2. The court correctly defined the appellant's burden to prove the affirmative defense of suicide by a preponderance of the evidence.

3. The evidence to establish suicide was insufficient.

4. The trial court did not err in excluding certain evidence offered by the appellant; i. e., evidence as to motive: the insurance adjuster's report, the hypothetical question, *supra,* and portions of the police officers' reports and of the coroner's testimony.

5. The evidence is consistent with the theory of accident and inconsistent with one of suicide—especially the fact that after the shot was fired, Houston, mortally wounded, struggled 15 or more feet "toward the exit from the basement and help".

6. The testimony of the appellee's experts concerning the characteristics of the gun was admissible, and in any event the appellant was not prejudiced by that evidence.

7. The court's finding that Houston did not "fraudulently misrepresent his habits in the use" of intoxicants is supported by the evidence.

8. The appellant had the burden of establishing the affirmative defense of fraud.

9. The evidence establishes that Houston did not misrepresent his drinking habits.

10. The trial court did not err in excluding testimony given by the appellant's assistant secretary regarding the appellant's underwriting practices respecting drinking habits.

11. The Court was right in awarding interest from May 4, 1954.

5. *The Appellant Had the Burden to Establish, by a Preponderance of the Evidence, the Affirmative Defense of Suicide*

■ The rule in California and elsewhere is that the insurance company has the burden of establishing the affirmative defense of suicide.

In Beers v. California State Life Ins. Co., 1927, 87 Cal.App. 440, 456–457, 262 P. 380, 387, hearing denied by the State Supreme Court, 1928, the Court said:

"It must be borne in mind that the defendant entered the trial charged with the burden of overthrowing the presumption that the deceased was sane, and that her death was not suicidal but from a natural cause. [Authorities cited.] It rested upon the defendant, to overcome said presumption, or, in other words, to support the affirmative defense of suicide 'by a preponderance of clear and satisfactory evidence, direct or circumstantial.' [Authorities cited.] And whether the defendant introduced sufficient satisfactory proof to overcome that presumption or to sustain that defense was a question to be solved by the jury, with whose conclusion we are not privileged, legally, to interfere, unless the evidence of suicide is upon its face obviously such as to compel us to hold that no other inference but that of intentional self-destruction may reasonably be drawn."[1]

■ It is well settled in California that the presumption against suicide is itself evidence. Section 1957 of the Code of Civil Procedure reads as follows:

"Indirect evidence is of two kinds:

"1. Inferences; and,

"2. Presumptions."

With reference to this rule as applied to suicide, in Byers v. Pacific Mutual Life Ins. Co., 1933, 133 Cal.App. 632, 637, 24 P.2d 829, 830, in which a petition by the appellant in that case to have the cause heard in the State Supreme Court was denied on October 6, 1933, it was said:

"In Smellie v. Southern Pacific Co., 212 Cal. 540, 299 P. 529, it was

1. See also 28 Cal.Jur. 2d, Insurance, § 599, pages 367–370; 29 Am.Jur., Insurance, § 1445, page 1085.

held that, where a presumption arises in favor of a party which is not overcome by evidence produced and offered by that party, it remains as evidence before the jury until a verdict is reached. In the instant case the presumption against suicide and in favor of death caused solely by accidental means was not overcome by the evidence offered by [the] appellant. It therefore remained with the jury as evidence, and, the jury having returned a verdict in accordance with that presumption, it supports such verdict and the judgment entered upon it."

■ When the insurer relies upon the theory of suicide to escape liability, the circumstances must exclude with reasonable certainty any hypothesis of death by accident or "by the act of another".

In Prudential Insurance Co. of America v. Baciocco, 9 Cir., 1929, 29 F.2d 966, 967, certiorari denied, 1929, 279 U.S. 854-855, 49 S.Ct. 350, 73 L.Ed. 996, Judge Dietrich said:

"It is not controverted that death by drowning is a death by external and violent means within the terms of the policy, nor is it questioned that in cases of this character where such a death is shown there is a presumption against the theory of suicide. [Case cited.] It is also conceded that by reason of this presumption appellant had the burden of proving the contrary, and that where, as here, evidence of self-destruction is circumstantial, the insurance company must fail 'unless the circumstances exclude with reasonable certainty any hypothesis of death by accident, or by the act of another.' [Case cited.]

"We cannot say that the court below erred in holding that the circumstances fail to measure up to this requirement. * * *

"From a consideration of the entire record, we are of the opinion that the manner of the insured's death is an unsolved mystery, and that we would not be warranted in disturbing the finding of the lower court."

6. *In the Instant Case, the Proponent of the Suicide Theory Has Not Successfully Carried the Burden of Proof*

■ We have fully outlined the evidence and the opposing theories relating to both the physical facts and what may be termed the psychological facts connected with Houston's death. We need here make but passing reference to either type of facts.

(a) The Physical Facts

On the physical side, the suicide theory propounded by the appellant is based upon the fact that the bullet entered the chest while Houston was bent "over the gun until his fingers were accessible to squeeze or push down upon the trigger, and his chest-heart area was within an inch of the gun muzzle", etc.

To spell out suicide from these physical facts one must indulge in a series of inferences:

(a) Houston knew that the particular gun was loaded;

(b) He knew that the cartridge was in position to be fired; *or*

(c) He deliberately loaded and cocked the gun;

(d) He placed the gun upon the floor, muzzle up, and in the narrow passageway assumed an unnatural and cramped position;

(e) He "squeezed" or "pushed down upon the trigger", while "his chest-heart area was within an inch of the gun muzzle", etc.

The Court below was of the view that "The position of gun and body appears equally consistent with the theory of accident" and that "The physical facts do not spell out a clear case of suicide. There is room for speculation as to how the shooting actually took place."

With these views we agree.

### (b) The Psychological Facts

Kenneth C. Pine, a police patrolman for the City of Berkeley, testified that Mrs. Houston had told him "at the beginning" that her husband "had at times suffered periods of depression". She added, however, according to the same officer, that "he was in fine spirits over the past weekend, he had been in good spirits of late except that he was working hard, working long hours getting out some reports which were a yearly function * * * in his business." Mrs. Houston was quoted as saying that her husband "was under stress at times, like these, when he was preparing these reports."

The circumstances of the shooting do not compel an inference of suicide. Neither does the fact that Houston "was careful with firearms" negative the possibility of accident.

As for the rest—the trip to Lakeview—we cannot say that this incident adds up to a likely motive for suicide. Further discussion of this phase of the case will be found in the next succeeding section.

### 7. *There Was No Error in the Exclusion of Certain Evidence Offered By the Appellant*

It is complained that the trial Court erred in excluding certain evidence on the question of motive. We will consider these offers *seriatim*.

### (a) The Insurance Adjuster's Report

Despite the appellee's objection, the appellant read into the record, as we have seen, the report of Van Doren, the insurance adjuster, dated October 22, 1953, relating to the accident in which Houston had been involved while driving a Cadillac sedan owned by the New Zealand Insurance Company. We have already given the substance of that report in some detail, and have seen that it was stricken from the record.

The first objection that may be urged against this report, offered to show Houston's possible feelings of "remorse", is its remoteness in point of time. The accident occurred on October 19, 1953. So far as the record shows, the only aftermath of the incident was a letter received by Houston, dated Oakland, California, November 9, 1953. The letter, which was from the prostitute involved in the accident, and was signed "Pat", addressed Houston as "Dear Bill", complained that he was avoiding her, and asserted that "The least you can do is help me get out of town, even if it's a loan."

Taylor, who was an attorney for the New Zealand Insurance Company, and who had been acquainted with Houston both in a business and in a social way for ten years or so, testified that he dictated to Miss Hoffman a reply to "Pat's" letter. The reply, which was dated November 10, 1953, stated that Houston "was not in a position to advance any funds", referred her to the assistant claims superintendent of the London Guarantee and Accident Company, Ltd., and informed her of the name of the doctor who had treated her in Lakeview.

In the first place, the Lakeview incident would not be at all likely to disturb the conscience of a man of the type depicted by the appellant's own evidence. The accident was not fatal, and the entire Lakeview escapade would be dismissed as of inconsequential importance. The appellant has given us a portrait of a man not likely to have his conscience gnawed by a joyride with a harlot. In a word, the insurance company has proved too much.

Furthermore, the relation of cause and effect is too remote in point of time. According to the evidence, the last communication with the divorcee was, as we have seen, on November 10, 1953. Houston was killed on February 22, 1954— more than three months later. Had Houston suffered from what certain theologians might term pre-confession "scruples", they would have led to to the tragic climax long before the latter date. Any such theory of delayed remorse is simply untenable.

## 534

### (b) The Hypothetical Question

■ The appellant contends that the trial court committed prejudicial error in sustaining the appellee's objection to the hypothetical question put to Dr. Bennett, the psychiatrist, *supra*.

Dr. Bennett never examined Houston. When such is the case, the value of a hypothetical question is held in low esteem by the courts of California.

In Estate of Dolbeer, 1906, 149 Cal. 227, 242–243, 86 P. 695, 702, Mr. Justice Henshaw sharply criticized this type of testimony:

"* * * in addition to this direct testimony, contestant offered three physicians, no one of whom had known Miss Dolbeer in her lifetime, and to whom were given long hypothetical questions purporting to array the facts in the case—the insanity of Miss Dolbeer's mother during her pregnancy and afterwards until her suicide, two years later, the insanity upon her father's side, the facts of Miss Dolbeer's life, her mental and emotional characteristics, and her death by suicide. These three medical experts, in answer to these long hypothetical questions, replied that, upon the assumption of the truth of the facts stated, they were of the opinion that 'at the time of her death' Miss Dolbeer was of unsound mind and suffering from a form of insanity known to medical science as 'simple melancholia.' The witnesses were skilled alienists, it may be conceded; but the evidence thus adduced *of one who has never seen the person, and who bases his opinion upon the facts given in a hypothetical question, is evidence the weakest and most unsatisfactory.* Such questions themselves are *always* framed with great particularity to meet the views of the side which presents the expert. They

*always* eliminate from consideration the countervailing evidence, which may be of a thousand-fold more strength than the evidence upon which the question is based. They are astutely drawn, and drawn for a purpose, and that purpose *never* is the presentation of *all* the evidence. It is *never* to present the fair and accurate view, but the purpose *always* is to frame a question such that the answer will announce a predetermined result. This kind of expert testimony, given under such circumstances, *even the testimony of able and disinterested witnesses,* as no doubt these were, *is in the eye of the law of steadily decreasing value. The remedy can only come when the state shall provide that the courts, and not the litigants, shall call a disinterested body or board of experts, who shall review the whole situation and then give their opinion, with their reasons therefor, to the court and jury, regardless of the consequences to either litigant.* So, and so only, can it be hoped to remove the *estimate of infirmity* which attaches at the present time to this kind of evidence." [Emphasis supplied.]

A full discussion of the discretion of the trial court as to the permissibility of hypothetical questions in general is to be found in our recent opinion in Andersen v. United States, 9 Cir., 237 F.2d 118.[2]

Furthermore, even if we assume, for the sake of the argument, that the Court erred in sustaining the objection to the hypothetical question, the exclusion was not prejudicial. The probative value of an affirmative answer would have been minimal; for the concluding sentence of the question was as follows:

"Now, from my description and assumptions here, Doctor, will you tell me whether that individual falls into one of the suicidal types?"

---

2. See also In re Estate of Collins, 1917, 174 Cal. 663, 670, 164 P. 1110; In re Estate of Hess, 1920, 183 Cal. 589, 598, 192 P. 35; In re Estate of Rich, 1947, 79 Cal.App.2d 22, 33–34, 179 P.2d 373; hearing by the Supreme Court denied, 1947; 19 Cal.Jur.2d § 300, page 28.

The fact that an individual "falls into one of the suicidal types" is a far cry from saying that, in the instant case, the death was caused by suicide.

Our careful examination of the record has convinced us that the court below committed no reversible error in sustaining the objection to the question.

**(c) The Trial Court Did Not Commit Prejudicial Error in Excluding Evidence Relating to the Coroner's Jury Verdict, and Excluding Portions of Certain Police Reports.**

The appellant specifies as error the exclusion of certain testimony offered by it, as follows:

**A. Testimony of Police Officers Relating to The Suicide Theory**

The substance of the excluded "testimony" of Patrolman Pine appears in one of the appellant's exhibits:

"In my opinion, the victim took the gun from a place of storage other than in the outer basement section, went to the far corner of the outer basement section, secured the shell from the paper bag, loaded the gun, bent over it and pulled the trigger."

The appellant asserts that the excluded testimony of Inspector Edwin F. Parker, of the Berkeley police department, "presumably would have been the same as his report", part of the appellant's exhibits in this case:

"While no suicide notes were found and no reason is apparent at this time for his committing suicide, the very nature of the wound is such that it would be highly improbable that it was an accidental one. * *"

**B. The Coroner's Opinion**

The questions asked of the coroner, Bernard D. Bungarz, to which the Court sustained objections, were:

"Q. And did you tell Mr. Angell [counsel for the appellee] that you had reached a conclusion yourself at that time?

\* \* \* \* \* \*

"Q. And did you tell Mr. Angell the reasons why you had reached the conclusion you had reached?

\* \* \* \* \* \*

"Q. Was there any testimony given at the inquest which in any manner changed your original impression?"

The appellant argues that "It was prejudicial error for the trial court to permit [appellee] to put into evidence the inadmissible coroner's jury verdict and yet prevent appellant from rebutting or explaining the circumstances surrounding the verdict or from rebutting with opinion evidence of its own, the opinions therein, or the opinions of [appellee's] witnesses."

■ The coroner's death certificate was admitted over the appellant's objection, and the verdict of the coroner's jury was admitted "subject to motion to strike," and over the appellant's objection. It does not appear that the appellant ever made such a motion, but we will nevertheless consider on its merits the appellant's objection to the offer in evidence of the coroner's jury's verdict.

The death certificate, dated March 29, 1954, showed that death was due to "external violence, undetermined". The verdict of the coroner's jury, which bore the same date, was that "This jury is unable to decide from the evidence whether this is suicidal or accidental."

These documents were admissible in evidence. Connecticut General Life Ins. Co. v. Maher, 9 Cir., 1934, 70 F.2d 441, 444, certiorari denied, 1934, 293 U.S. 591, 55 S.Ct. 106, 79 L.Ed. 685; Ellenberger v. City of Oakland, 1946, 76 Cal.App. 2d 828, 835, 174 P.2d 461, petition for hearing by the State Supreme Court denied, 1947, cited in Stanford Law Review, July, 1953, Vol. 5, Page 754, Note 20; and Bryson v. Manhart, 1936, 11 Cal.App.2d 691, 696, 54 P.2d 778, cited by the appellant itself.

■ The testimony of police officers and the coroner who investigated the shooting could not have detracted from

the fact that the coroner's jury was unable to reach a determination.

It is clear that the appellant was trying to show from the testimony of the police officers and the coroner, that their conclusion was that the death was suicidal. This was the ultimate fact to be determined by the court, and not, especially under the record as it stood with the verdict of the coroner's jury, a fact regarding which either the coroner or the police should have been permitted to express an opinion.

We find no reversible error in the exclusion of this evidence.

8. *Nor Was There Error in the Admission of Testimony by Appellee's Experts Concerning the Characteristics of the Gun*

Counsel for the appellant objected to the testimony of Dr. Kirk, professor of criminalistics at the University of California, *supra,* relating to firing tests conducted with the death gun. It was contended that it would be evidence of tests "by a ballistics expert which anybody could perform"; that there was no showing "that these various tests involve the way the gun was discharged at the time of the shooting, except that the trigger would be pulled"; and that "it would be rank speculation * * * to try to conjecture or speculate on how a gun might be accidentally discharged, when there is no proof of any such accident".

The precise question that Dr. Kirk was asked and to which objection was made was the following:

"Q. Now will you state in your own words the results of your examination, as to the different methods by which that gun could be fired?"

█ It is well settled that an expert witness may give his opinion regarding the mechanical operation of a gun and the method by which it may be fired. In People v. Willis, 1924, 70 Cal.App. 465, 473, 233 P. 812, 815, petition to have the cause heard in the State Supreme

Court denied by the said Court, 1925, it was said:

"In the instant case the witness did not express any opinion concerning the positions of the deceased and defendant. He drew no conclusions at all, except in connection with the gun and its operation. As to this it is not questioned that he qualified as an expert, nor can there be any doubt that this was a proper subject for expert testimony. The witness' statement that, holding the gun in a certain position, it was difficult to pull the trigger is merely a statement of fact, and, at the same time, an explanation of the mechanical operation of the firearm.

"It does not appear that the witness gave any conclusions concerning his experiments when he and the other man assumed the positions on the floor to which he testified."[3]

Dr. Kirk testified that in addition to the "normal manner", the gun "could be fired if the hammer is on the firing pin, it could be fired by striking the butt"; and perhaps "by a snapping action between the half-cocked position and the fully down position; that is, there was always an indentation placed in the primer of this gun under those circumstances, but it was normally not deep enough to fire. It could happen, however."

Bradford, who at the time of the trial was the director of the laboratory of criminalistics of Santa Clara County, California, said that if the gun was "pulled out of position with anything and dropped it would [have a tendency to] drop close to that position". In a word, the gun "could be discharged either accidentally or intentionally." He testified that when he and Dr. Kirk made the tests with the gun to determine the manner in which it could be discharged, they placed "in the chamber of the barrel a round of ammunition from which had been removed the bullet and the powder, the detonating cap or primer

3. See also 19 Cal.Jur.2d, Evidence § 367, page 95.

still being in the cartridge case." The appellant contends that such removal "might" make a "vast difference in results", but no evidence to that effect was introduced. The trial court found that the removal of the "lead slug" "from the gun for safety purposes * * * in no way affected the tests on the mechanical operation of the gun."

The shells used for the experiments were removed from a paper bag in the basement of the Houston residence, and fitted the death gun.

■ There was a sufficient similarity between the fatal shell and the test shells used in the death gun, to justify the admission of the tests. 18 Cal.Jur. 2d, Evidence, § 205, page 678.

■ The admission of such evidence is generally a matter within the discretion of the trial court, and the conditions surrounding a test or experiment of this nature "need not be identical with those existing at the time of the occurrence in question provided there is a substantial similarity." Ortega v. Pacific Greyhound Lines, Inc., 1937, 20 Cal. App.2d 596, 597–598, 67 P.2d 702, 703, quoted with approval by the Supreme Court of California in Beresford v. Pacific Gas & Electric Co., 45 Cal.2d 738, 748, 290 P.2d 498, which latter case was decided on December 9, 1955, and was apparently overlooked by counsel. See also 18 Cal.Jur.2d, loc. cit.

■ Furthermore, the appellant's counsel himself brought out facts concerning the experiments. In cross-examining Dr. Kirk, the attorney elicited the information that the gun was discharged once by being dropped or struck upon the floor. In summarizing the witness's testimony on this phase of the experiments, counsel for the appellant said:

"Q. And the only time that you could do it the other way, [by dropping it when the hammer was on the firing pin] even though you tried, was to have it discharge once; is that right?"

And the witness replied in the affirmative.

In People v. Dye, 1947, 81 Cal.App.2d 952, 961–962, 185 P.2d 624, 630, a case that had been tried before the writer of the present opinion when he was a judge of a superior court of California, a line of questioning by the defendant's counsel brought out substantially the same testimony that on appeal he complained had been erroneously admitted. The appellate court found that there was no error in the admission of such testimony. Presiding Justice Adams made the following comment:

"If there was any error in permitting this testimony, it was cured on the cross-examination of the witness * * *."

See also People v. Dollor, 1891, 89 Cal. 513, 517, 26 P. 1086.

■ Finally, there is a point that seems to have been unnoticed by counsel. In a case of this kind, where trial was to the court, it will be presumed that the District Judge disregarded any inadmissible testimony. In J. J. McCaskill Co. v. United States, 1910, 216 U.S. 504, 516–517, 30 S.Ct. 386, 392, 54 L.Ed. 590, the Court said:

"The purpose of the testimony of other transactions, counsel say, was 'to show a systematic course of dealing by McCaskill, such as would support a contention that he had guilty knowledge of whatever fraud might exist in the procurement of the patent in litigation.' It is admitted that the testimony was competent for such purpose, but it is contended it should have been accompanied by evidence showing that such other transactions were false and fraudulent, and this, it is insisted, was not done. If so, the testimony was harmless. In other words, if the testimony was not followed up by other testimony which was necessary to give it effect, we may assume that the court below gave to it no value or probative strength. *It must be kept in mind that the case was*

*tried by the court."* [Emphasis supplied.] [4]

In the instant case, however, the appellate court is not required to make any such "assumption". The trial court has left the matter beyond cavil by stating "that it would reach exactly the same decision in this case whether this evidence was presented or not." In its reply brief, the appellant terms this a "self-serving" statement. We regard this comment as uncalled-for, and we ignore it.

There was no reversible error in the admission of testimony by the appellee's two experts on criminalistics.

9. *There Is Evidence That Houston Did Not Misrepresent the Extent of His Use of Intoxicating Liquor*

(a) The Appellant Has the Burden of Establishing the Defense of Fraudulent Misrepresentation.

It will be recalled that in the decedent's application for insurance he stated that he used "alcoholic stimulants" "socially only occasionally". As we have noted in § 2 of this opinion, there was considerable testimony that Houston did not use alcoholic stimulants to excess.

In a case of this kind, the insurance company has the burden of proving fraud. As was said in Truett v. Onderdonk, 1898, 120 Cal. 581, 588, 53 P. 26, 29, "The presumption is always against fraud,—a presumption approximating in strength to that of innocence of crime, * * *."[5]

In one respect at least, the facts in McEwen v. New York Life Insurance Co., 1919, 42 Cal.App. 133, 141–143, 183 P. 373, 374, were more strongly in favor of the insurer than those at bar. There the questions and answers in the application for insurance, on the subject of liquor-drinking, were as follows:

"4(a) 'What is your daily consumption of wine, spirits, or malt liquors? A. No daily habit—occasional beer.'

"4(b) 'Have you at any time used any of them to excess? A. No.'"

It will be observed that it is arguable that the strong implication contained in Answer 4(a) was that the applicant drank only *beer*. As we shall see in a moment, the "conceded" facts were otherwise. Yet in the light of all this, the Court there used the following language:

"* * * suffice it to say that as to 4a the question was not whether McEwen had used liquor at all, but assumed as a fact that he did use them [sic]. The inquiry is directed solely to the extent of his daily consumption of such beverages. Hence, conceding that, as shown by the evidence, he did at times, varying in intervals of two to four weeks, drink both *beer* and *whisky*, such fact is not inconsistent with his answer, 'No daily habit—occasional beer.' The response made cannot, as urged by appellant, be construed as a representation that he never drank whisky at all; but, as we interpret the question and answer, it was simply a statement to the effect that he was not addicted to its daily use.

"The reply to question 4b is that he never at any time had used such liquors to excess. No court, so far as we are advised, has undertaken to define what constitutes the excessive use of alcoholic spirits. * * * The meaning of the word 'excess,' as here used, is largely a matter of opinion, depending upon the capacity of the individual and liberality of

4. See also United States v. Northern Pac. Ry. Co., 9 Cir., 1935, 77 F.2d 587, 590; Jackson Furniture Co. v. McLaughlin, 9 Cir., 1936, 85 F.2d 606, 609; Bailey v. Sears, Roebuck & Co., 9 Cir., 1940, 115 F.2d 904, 907, certiorari denied, 1941, 314 U.S. 616, 62 S.Ct. 82, 86 L.Ed. 495.

5. See also Scoles v. Universal Life Insurance Co., 1872, 42 Cal. 523, 527; Everett v. Standard Accident Ins. Co., 1919, 45 Cal.App. 332, 338, 187 P. 996, petition to have the cause heard in the Supreme Court of California denied, 1920.

view entertained upon the subject by the individual, whose opinion might again be governed by the time, place, and occasion. [Cases cited.] In the absence of any standard of measurement, the question is one of fact to be determined by the jurors, whose conclusion, as stated, would depend largely upon their views as to what constitutes excess in the use thereof. It cannot be determined upon the quantity used, because of the fact that an amount which might affect one individual would not be noticeable upon another. The most of the testimony bearing upon the question was given by witnesses from Daggett, near which place it appears deceased was engaged in the operation of a mine, and from which he, from two to four weeks, went to Daggett, *at which times he concededly drank more or less whisky* and beer. There is little testimony touching the quantity of his libations. Apparently he did not drink sufficiently to interfere with his transaction of business and it fairly appears that there was a conflict of evidence as to the effect upon him of that which he did drink. Under the circumstances shown, we cannot say that the jury, upon the testimony as to his habits of drinking at Daggett, were not justified in their verdict that he did not drink to excess." [Emphasis supplied.]

In the McEwen case, supra, a petition to have the cause heard in the California Supreme Court after judgment in the district court of appeal. was denied by the former court on September 4, 1919.

(b) In View of the District Court's Finding That There Was No Misrepresentation by Houston Concerning His Drinking Habits, There Was No Error in Excluding Testimony Regarding the Appellant's Practices as to Such Habits.

 The appellant sought to have its assistant secretary and claims officer testify regarding "the company practice * * * with regard to an unfavorable personal history of drinking hab-

its" on the part of an applicant for insurance. The appellant argues that it "obviously * * * is proper to put to a qualified representative of appellant the question whether the policy sued upon would have been issued appellant [sic] under present underwriting practices if it had known deceased's history of drinking habits".

In the light of the District Court's finding that there was *no* misrepresentation by Houston regarding his drinking habits, the question of the appellant's "practices" with respect to unfavorable drinking habits was obviously moot.

Similarly, the appellant's corollary question, as to whether the policy would have been issued, etc., deals with a moot subject, in view of the Court's finding.

We hold that there was substantial evidence that the insured Houston did not misrepresent the extent of his use of intoxicating liquor and that, consequently, the exclusion of testimony relative to the appellant's "practices" and probable decision with respect to Houston's application had it known of his drinking habits, did not constitute reversible error.

10. *The District Court Erred in Awarding Interest from May 4, 1954, the Date on Which Proof of Loss Was Received by the Appellant*

 Under a "family income provision" attached to the policy, the appellee was entitled to receive a guaranteed income of $200 per month, commencing on February 22, 1954, and thereafter a like sum on the same day of each month to and including September 24, 1963, together with the sum of $10,000.00 on September 24, 1963. The Findings of Fact, however, further recite that:

"Said plaintiff [appellee] further has the right under said policy to *elect* to commute said monthly payments and receive a commuted value determined as set forth in said policy. The commuted value of said policy at the date of death was and is the sum of $28,552.00. * * *"
[Emphasis supplied.]

The correctness of the above finding is undisputed. It was stipulated that "the

proof of loss was duly filed and no objection was made to that proof of loss, other than those stated in the two separate defenses in the answer, namely, suicide and * * * misrepresentation in the application." It was likewise stipulated that "the commuted value of that policy [is] $28,552".

The record is bare of any showing that the appellee "elected" to receive a "commuted" value until she filed her complaint, on January 4, 1955. In her brief, however, she states that "there can be no question but that appellee was entitled to payment upon the receipt of proof of death at the company's head office". It was agreed that the proof of loss was received in the appellant's office on May 4, 1954.

The appellant, on the other hand, invokes the following section of the Civil Code of California:

"§ 1449. Loss of right

"Right Of Selection, How Lost. If the party having the right of selection between alternative acts does not give notice of his selection to the other party within the time, if any, fixed by the obligation for that purpose, or, if none is so fixed, before the time at which the obligation ought to be performed, the right of selection passes to the other party."

In its reply brief before this Court, the appellant suggests that interest should be allowed "to date of judgment upon the accrued amounts of family income". While expressing doubt as to whether even those amounts form the proper basis for computing interest, the appellant observes that "the latter amount of interest is the least erroneous".

We can agree with neither the appellant nor the appellee as to the proper basis for computing the interest to be allowed herein: nor are we satisfied with choosing merely the "least erroneous". So far as the record shows, the first "election" in favor of the "commuted value" of the policy was made by the appellee in her complaint filed in the Superior Court of Alameda County, California, on January 4, 1955. In its "Proposed Modifications to Plaintiff's Proposed Findings of Fact," etc., the present appellant stated:

"(b) Interest, in any event, can only be allowed from the date of commencement of this action, January 4, 1955."

The nearest approach to the correct date from which interest should be allowed is found in the above statement by the appellant—a statement that apparently now has been abandoned. The precise date is January 12, 1955, when the summons was served. Such service fulfilled the requirements of the "notice" prescribed by § 1449, supra.

We therefore order that the judgment below be modified so as to award interest from January 12, 1955, to February 8, 1956, at the rate of 7% per annum.

11. Conclusion

We hold that the appellant had the burden to establish, by a preponderance of the evidence, the affirmative defense of suicide; that it has not successfully carried that burden; that there was no error in the exclusion of certain evidence offered by the appellant; that the District Court did not err in admitting expert testimony relating to the characteristics of the death gun; that there is substantial evidence that the decedent did not misrepresent the extent of his use of alcoholic liquor; and that the lower court erred in awarding the appellee interest from May 4, 1954, the date on which proof of loss was received by the appellant. The correct date is January 12, 1955, when the complaint filed in the State court was served upon the appellant.

We concur in the language and in the reasoning of the Memorandum Opinion of the District Judge, and adopt it as our own.

We have modified the judgment below so that it shall award interest from January 12, 1955, to February 8, 1956, the latter date being that of the judgment. As thus modified, the judgment is

Affirmed.