[Civ. No. 10379. Third Dist. Oct. 4, 1963.]

SOUTH SACRAMENTO DRAYAGE COMPANY, Plaintiff and Appellant, v. CAMPBELL SOUP COMPANY, Defendant and Respondent.

Leonard P. Burke, Rudolf H. Binsch and William T. Sweigert for Plaintiff and Appellant.

Rowland & Paras and Darrel E. Pierce for Defendant and Respondent.

VAN DYKE, J.*—This is an appeal from a judgment based upon an order declaring a nonsuit against plaintiff in an action, tried to a jury, for breach of an alleged oral contract. We state the facts conformably to the rule governing review of such a judgment.

Defendant Campbell Soup Company is one of the great modern business corporations whose operations are both national and international in scope. Principally it is engaged in the manufacture and sale of various food products. At Sacramento, California, it maintains an extensive plant for the manufacture, distribution and sale of such products. It requires a considerable amount of shipping to and from its Sacramento plant, both of raw materials and of finished products, and it uses both rail and truck transportation. The shipping, material here, is a segment only of the total ship-

---

*Retired Presiding Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.

ping to and from the plant, and concerns two distinct types of truck transport. The first is "customer hauling" so called, sometimes referred to as "P.U.C." hauling, and embraces the hauling of finished products to defendant's customers, such as wholesale food distributors, chain market warehouses, and the like, throughout northern California and beyond. Such hauling is subject to the minimum rate regulation of the Public Utilities Commission. The second type is called "local" hauling, sometimes referred to as "exempt" hauling, since the rates for such hauling are not covered by P.U.C. rate regulations. This hauling constitutes the shipment of raw materials and ingredients between the Sacramento plant and storage points in the Sacramento area and the shipment of finished products to customers in the Sacramento area.

The contract, on the breach of which appellant founded its action, was alleged to have been made between one McReynolds, an employee of defendant corporation, acting as agent for said corporation, and one Mitchell, acting as an agent for plaintiff corporation. Mitchell was president and the principal owner of plaintiff corporation and no question is raised as to his capacity to bind the plaintiff corporation by contract. McReynolds was not an officer of defendant corporation. His job title was that of traffic manager of the Sacramento plant. He directed the transportation activities whereby materials and other supplies were brought to the Sacramento plant and finished products were shipped from the Sacramento plant. He was under the general supervision of the Sacramento plant manager and of the general traffic manager of Campbell in Camden, New Jersey. In performance of his functions as traffic manager of the Sacramento plant he contracted with various carriers for truck transportation of material and supplies to the plant for plant use, and for truck transportation of manufactured goods to customers throughout a large area, including northern California. This truck transportation he obtained by dealing with many carriers operating in the general area of the Sacramento plant on a load-by-load basis and sometimes by awarding hauling to a single concern on a basis whereby all or nearly all of the hauling between the Sacramento plant and another point would be for a time taken care of by a selected carrier. Subject to the general supervision above noted, it was the job of McReynolds to secure needed transportation

for Campbell and he attended to this for many years. Among trucking concerns with whom McReynolds dealt for Campbell was one which had been partly owned and generally managed by Mitchell, currently president and general manager of plaintiff. This prior concern being about to go out of business in November of 1956, Mitchell negotiated with McReynolds with the view of, in one form or another, succeeding to the business which the prior firm had been doing for Campbell. He inquired of McReynolds whether Campbell would deal with him if he started a new concern and was told that there was no reason why such arrangements could not be made. McReynolds advised him to submit a proposed schedule of rates for "local" hauling. A written contract dated December 4, 1956, for such hauling was entered into between plaintiff and Campbell. It was executed in behalf of Campbell, however, by one Leslie C. High, general traffic manager for Campbell, from his office in Camden, New Jersey. The contract covered local hauling for a period of one year and during its existence various supplements to the contract were executed in like manner as the principal contract. At the conclusion of the first yearly term a new written contract was in like manner executed between Campbell and plaintiff, again for one year. These contracts were confined to "local" hauling and included no customer hauling. However, during the performance of these contracts, Mitchell constantly solicited customer hauling from McReynolds and succeeded in obtaining a considerable amount. No term contracts were involved, the business being done on a load-by-load basis.

During the early months of 1958, and while performing under the second of the written contracts for local hauling, Mitchell had several consultations with McReynolds concerning the giving to him by Campbell of an exclusive contract to do all of the customer hauling, as well as all the local hauling, within the northern California area with certain exceptions. He testified as follows: Mitchell told McReynolds that it was impossible to profitably operate the plaintiff drayage company in view of the broad fluctuations of tonnage from day to day; that at times they would have many loads and other times none; that his company could not pay its bills and stay in business unless different arrangements were made to obtain a less fluctuating and a greater volume of hauling; that unless better conditions could be arrived at Campbell would have to get a new carrier but plaintiff would take care of Campbell until such time as that could be done;

that the only way plaintiff could profitably continue hauling for Campbell was by Campbell's giving plaintiff company specific contracts for hauling, and for a term long enough that plaintiff could depend thereon as a way of doing business. Mitchell testified that McReynolds said he would not give all of Campbell's hauling to plaintiff and that he replied he did not want all of the business, but if he, McReynolds, would give plaintiff "a specific with other customers" plaintiff would be able to have a very profitable operation, and if this could not be done they would necessarily have to get other business than Campbell's. Mitchell said there were several such conversations. In June 1958, at a conference between the two, McReynolds asked Mitchell to make a final suggestion. This Mitchell did, suggesting that effective July 15, 1958, plaintiff be given a 15-year exclusive contract for hauling all of the heat-processed canned food products shipped intrastate by Campbell in truckload lots to wholesale grocers and to volume-distribution warehouses of chain-store markets in all of California north of, and including Fresno, California, and Watsonville, California, with certain exceptions, the hauling to be done at current lowest legal rate authorized by the Public Utilities Commission of California; that plaintiff agree to haul exclusively for Campbell's and to obtain additional equipment necessary to perform the contract. There were other stipulations not necessary here to relate. Mitchell further testified that after considerable conversation and negotiation this was agreed to, McReynolds saying the contract seems reasonable to him and that it would be put into effect "right after shut down" (it appears that beginning July 1st and continuing to July 15th each year Campbell shut down its manufacture of soups and other finished products to get ready for the tomato pack). It was for the alleged breach of this contract that this action was brought.

There was evidence that the parties entered upon the performance of this contract, that Campbell gave more hauling to plaintiff, and that plaintiff, in reliance on the contract, purchased through lease-purchase form a large amount of equipment; that Campbell soon began to give hauling covered by the alleged contract to other carriers; that, unable to operate further under such conditions, plaintiff declared breach; and that the equity in equipment purchased to fulfill the contract was lost, along with profits plaintiff could have

made had Campbell performed. Summing up, on the issue of contract or no contract, plaintiff made out a case for the jury if McReynolds had authority to bind Campbell by the contract he purported to make as Campbell's agent.

■■ The following code sections on the subject of an agent's authority to bind his principal are pertinent here. Civil Code section 2315 provides that: "An agent has such authority as the principal, actually or ostensibly, confers upon him." Civil Code section 2316 provides: "Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." Civil Code section 2317 provides: "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess."

The Supreme Court of this state in *Columbia Outfitting Co. v. Freeman,* 36 Cal.2d 216, stated at page 218 [223 P.2d 21]:

"Section 2316 of the Civil Code provides that 'Actual authority is such as a principal intentionally confers upon the agent [i.e., express authority], or intentionally, or by want of ordinary care, allows the agent to believe himself to possess [i.e., implied authority].' "

There is no evidence here that Campbell intentionally or expressly conferred on McReynolds authority to make the alleged contract for a period of 15 years. All the evidence is to the contrary. There could be no implied authority unless McReynolds believed that he had such authority, and such belief must have been engendered either by the express intent, to create it in the mind of McReynolds by Campbell, or by reason of Campbell's so carelessly conducting its affairs as to reasonably create such belief in the mind of McReynolds. The record will not support either alternative. There is no proof that McReynolds ever contracted for hauling by trucks, other than upon a casual day-by-day or load-by-load basis, except in the two instances wherein he negotiated for Campbell with plaintiff the two yearly contracts for local hauling; and in each of these instances the contract was executed by Campbell's general traffic manager in Camden, New Jersey. While we are bound by the testimony that Mc Reynolds purported to make the alleged contract and might therefore appear to have believed he could do so, since he so acted, the fact of belief is not enough. It must be shown that the belief was engendered by conduct of the principal. To

hold otherwise would give any agent, not the authority, but the naked power to bind his principal to any contract within the general scope of his duties, however fantastic or detrimental to the principal's interest such contract might be.

 We turn now to ostensible authority and it appears from the briefs and the arguments on appeal that appellant relies mainly upon such authority to sustain its appeal.

"Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (Civ. Code, § 2317.)

Here, we are concerned with the belief of plaintiff that McReynolds' authority existed and here again this belief must be shown to have been reasonably engendered by the conduct of Campbell. Ostensible authority must be based upon acts or declarations of the principal and not the conduct or representations of the alleged agent. (*Lee* v. *Helmco, Inc.*, 199 Cal.App.2d 820, 834 [19 Cal.Rptr. 413].) There is no proof, indeed no claim is made that such proof was made, that Campbell intentionally sought to engender in the mind of Mitchell, the only agent of plaintiff who dealt in the matter, any belief with respect to the authority of McReynolds to bind Campbell by the alleged contract; and the record is equally devoid of any showing that Campbell engendered a belief as to McReynolds' authority in the mind of Mitchell by want of ordinary care in its dealings with plaintiff. The only occasions when, prior to the execution of the alleged contract, Mitchell had dealt with McReynolds on other than a day-by-day or load-by-load basis in constant competition with other carriers were the two instances wherein Mitchell sought exclusive contracts for local hauling in the Sacramento area for a definite term. In each case the contract was not consummated by McReynolds, but, on the contrary, was reduced to writing and forwarded to New Jersey, where it was executed by McReynolds' superior, the general traffic manager of Campbell. Under the circumstances shown by this record, it is proper to apply the principle stated in 1 Mechem on Agency, second edition, page 527: " ... It is therefore declared to be a fundamental rule, never to be lost sight of and not easily to be overestimated, that persons dealing with an assumed agent, whether the assumed agency be a general or special one, are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority and in case either is

controverted, the burden of proof is upon them to establish it."

The foregoing was quoted and applied by our Supreme Court in *Original M. & M. Co.* v. *San Joaquin etc. Corp.*, 220 Cal. 152, at page 162 et seq. [30 P.2d 47]. Notwithstanding his past experience in dealing with Campbell through McReynolds, and he never dealt otherwise, Mitchell made no inquiry whatever as to McReynolds' authority to negotiate the alleged contract, and it cannot be said that he reasonably held, or justifiably held, a belief, engendered by conduct of Campbell that McReynolds had such authority.

Respondent advances a number of contentions supportive of the judgment appealed from other than those we have considered but what we have said heretofore makes it unnecessary to discuss these contentions.

The judgment appealed from is affirmed.

Schottky, Acting P. J., and Friedman, J., concurred.