382 F.2d 689
 KAMEN & CO., a limited partnership, and Edward F. Liebert and Abraham Kamen, general partners, Appellants and Cross-Appellees,
v.
PAUL H. ASCHKAR & COMPANY, a limited partnership, Appellee and Cross-Appellant.
 No. 19922.
 United States Court of Appeals Ninth Circuit.
 July 7, 1967.
 
 1
 Bertram Fields, Shearer & Fields, Los Angeles, Cal., for appellants.
 
 
 2
 Gary Schlessinger, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for appellee.
 
 
 3
 Before BARNES and DUNIWAY, Circuit Judges, and McNICHOLS, District Judge.
 
 
 4
 McNICHOLS, District Judge.
 
 
 5
 This is an appeal and cross-appeal from a final judgment of the District Court in favor of the appellee, plaintiff below, for the amount paid for certain worthless stock alleged to have been purchased because of fraudulent conduct of certain agents of the appellants.
 
 
 6
 Jurisdiction of the District Court was invoked pursuant to 15 U.S.C. § 77v, Securities Act of 1933, 15 U.S.C. § 78aa, Securities Exchange Act of 1934, and 28 U.S.C. § 1332, the diversity statute. Jurisdiction here exists by reason of 28 U.S.C. § 1291.
 
 
 7
 The parties on appeal are: Paul H. Aschkar and Company (hereinafter Aschkar) appellee and cross-appellant; Kamen & Company, Kamen's partners, Abraham Kamen and Edward F. Liebert, appellants and cross-appellees (hereinafter collectively referred to as Kamen).
 
 
 8
 The following facts, not seriously disputed by the parties, gave rise to the litigation.
 
 
 9
 Aschkar, a limited partnership, is an over-the-counter broker-dealer in the business of buying and selling securities not listed on any national exchange, either for customers or for its own account. Its sole place of business is Los Angeles, California, and all of its partners are either natural or corporate citizens of the State of California. Aschkar was registered with the Securities and Exchange Commission and was a member of the National Association of Security Dealers.
 
 
 10
 During the period involved, i. e., January 1, 1963 to July 31, 1963, Kamen, a limited partnership dealing in securities, maintained its sole place of business at New York City, and was a member of the New York Stock Exchange and the American Stock Exchange. Abraham Kamen was Kamen's managing partner.
 
 
 11
 Early in 1963 Kamen, through its managing partner, hired Laurence H. Ross and Jerome M. Grossinger as registered representatives.[1] Their employment by Kamen was based upon representations that the firm's commission business could be greatly increased by obtaining the "listed business"[2] of broker-dealers throughout the country who were not members of the New York or American Stock Exchanges.
 
 
 12
 Ross and Grossinger represented to Kamen that if it would offer certain special services[3] to such broker-dealers, they in turn would give Kamen their listed business. Ross and Grossinger claimed to have conducted a traveling survey of small broker-dealers around the country who were not members of any national exchange and had found that these services were the kind such brokers were in need of and for which they would in return give Kamen their listed business. Prior to this time Kamen had not dealt with broker-dealers for their listed business.
 
 
 13
 Kamen established a broker-dealer division within the firm and placed Ross and Grossinger in charge thereof. They were given the authority to do all things necessary and proper in carrying out the duties of the office including authority to place over-the-counter orders with broker-dealers.
 
 
 14
 Ross was authorized by Kamen to have printed a business card which described him as the "Manager" of the Broker-Dealer Division of Kamen & Co. One such authorized card was sent to and received by Aschkar. A WATS type telephone system was installed to facilitate the new services to be offered.
 
 
 15
 As predicted by Ross and Grossinger, Kamen enjoyed a substantial volume of listed business during the first half of 1963. However, it developed that the marked increase in volume of listed business was not due solely to the special services which Kamen offered to broker-dealers as an inducement. Unknown to Kamen, the new Manager of the Broker-Dealer Division had perfected a fraudulent scheme calculated both to increase legitimate commissions through listed business and also to create a market for a quantity of worthless non-listed stock.
 
 
 16
 Ross and Grossinger used the offices and facilities of Kamen to carry forward their fraudulent activities. Pursuant thereto, they would telephone various over-the-counter broker-dealers around the country advising that they were employed by Kamen, a member of the New York Stock Exchange. The contacted broker-dealers were requested to purchase or sell securities listed on the New York and American Exchanges through Kamen and were promised that, in return, Kamen would channel certain business in non-listed securities to such broker-dealers.
 
 
 17
 To carry out the scheme, they would call a first broker-dealer and request him to purchase a specific number of the valueless shares of Jerome Richards & Co., Inc. stock[4] (hereinafter Jerome) from a second broker-dealer at a specific price and sell said shares to a third broker-dealer at a price slightly higher than the first broker-dealer's purchase price. At about the same time and unknown to the first broker-dealer, the third broker-dealer would be called by Ross, Grossinger or others and be induced to purchase the shares from the first broker-dealer and sell them to a fourth broker-dealer at still a slightly higher price. The fourth broker-dealer would be called by Ross, Grossinger or others and induced to purchase said shares and sell them to a fifth broker-dealer at yet an even higher price, and so on in a long chain.
 
 
 18
 It was implied to the contacted broker-dealers that the orders placed by Ross and Grossinger were bona-fide orders received by Kamen. However, Kamen had not in fact received such orders. No market existed for Jerome stock except the artificial one created by the dealings of Ross, Grossinger and others. In addition, a representation was made by Ross and Grossinger to some of the broker-dealers, including Aschkar, that Kamen guaranteed both seller and purchaser would perform as promised. In other words, both a seller and purchaser were provided, with a guaranteed profit to the broker-dealer.
 
 
 19
 Aschkar became involved in the foregoing fraudulent scheme on or about July 10, 1963 when he was initially contacted by phone by Ross or Grossinger soliciting Aschkar's listed business in return for which Kamen would give Aschkar its over-the-counter business. During this same phone conversation, Aschkar was induced to purchase 700 shares of Jerome stock from Frederick Cirlin & Associates, Inc., a broker-dealer located in New York for $19.25 per share and simultaneously sell for $19.375 per share to McNeel & Co., a broker-dealer located in Atlanta, Georgia. McNeel confirmed the purchase but refused delivery of the stock when it was subsequently tendered.
 
 
 20
 On July 17, 1963, Aschkar was called by Ross and offered another transaction whereby Aschkar was to purchase 1,000 shares of Jerome stock from Frederick Cirlin & Associates, Inc., for $19.25 per share and sell such shares to Handley Investment Company, a broker-dealer located in Tulsa, Oklahoma, for $19.50 per share. This transaction was confirmed by the parties but never executed.
 
 
 21
 On the same date, July 17, 1963, and approximately eight minutes after the above described transaction, Ross again called Aschkar and offered him a transaction whereby he would purchase 600 shares of Jerome stock from Gus and Stead Company, a broker-dealer located in Salt Lake City, Utah, for $19.00 per share and sell the same 600 shares to Frederick Cirlin & Associates, Inc., for $19.25 per share. Aschkar purchased this stock but it was not accepted when tendered.
 
 
 22
 As of July 23, 1963, Aschkar had purchased 1300 shares of Jerome stock for $24,875.00. On July 24, 1963, the fraudulent scheme of Ross and Grossinger came to light in the securities industry and the Jerome stock was valueless. Aschkar has been unable to dispose of the stock, as the promised purchasers, alerted to fraud, refused to pay.
 
 
 23
 Plaintiff brought suit to recover the said sum of $24,875.00 from the defendants. Statutory liability, predicated on alleged violations of certain provisions of the Securities Act of 1933[5] and of the Securities and Exchange Act of 1934[6] was claimed. Additionally, plaintiff alleged common law liability based on the law of agency.
 
 
 24
 By way of answer, defendants denied liability generally. Defendants' affirmative defense (a) alleged that the agents, Ross and Grossinger, acted without authority and (b) that the transactions involved were illegal and in violation of Stock Exchange rules which facts were known to the plaintiff and that plaintiff knew or should have known that the agents were not authorized to offer the transactions, so that plaintiff was not justified in relying on any ostensible agency. Further, defendant advanced the theory that plaintiff was obliged to reduce or eliminate any damage by first seeking to force the so-called "promised purchasers" to pay for the worthless stock.[7]
 
 
 25
 The trial court, sitting without a jury, found no liability under the theory of violations of the statutory provisions of the Securities Acts. However, judgment, founded on the fraudulent acts of defendants' agents was entered in the sum of $24,875.00 plus interest from the date of purchase of the stocks by plaintiff in July, 1963.
 
 
 26
 Appellant relies on two grounds for reversal, i. e., that the Court erred in finding that there was ostensible authority for the acts of Ross and Grossinger and hence liability on the part of the defendants for the damages arising out of the agents' fraudulent acts and that it was error to hold the defendants liable for the full price paid by the plaintiff for the stocks where plaintiff had an existing right of action aginst the third party firm which had agreed to purchase from the plaintiff.
 
 
 27
 Aschkar presents a protective cross-appeal in which three errors are cited:
 
 
 28
 "1. The trial court erred in failing to conclude that the duties imposed by the Securities Act of 1933 and the Securities Exchange Act of 1934 on members of national exchanges are non-delegable and that any violation thereof by an employee renders his employer civilly liable to the same extent as if the employer himself violated the Acts.
 
 
 29
 "2. The standard of care imposed by the trial court on a member firm of the New York Stock Exchange in supervising the activities of its employees was shockingly inadequate.
 
 
 30
 "3. The court erred in refusing to admit into evidence a report in affidavit form prepared by an investigator for the Securities and Exchange Commission in the performance of his official duties proving that Appellants had knowledge of the fraud being committed by their employees."
 
 
 31
 Briefly summarized, the trial court's findings of fact here pertinent are: an agency relationship between Kamen and Ross and Grossinger was established upon their employment by Kamen and placement in charge of the Broker-Dealer Division of Kamen & Co.; upon employment the fraudulent scheme previously described was carried out by Ross and Grossinger as an object of their employment, i. e., to secure listed business, and therefore within the scope of their employment; Ross and Grossinger had actual authority to solicit listed business from over-the-counter broker-dealers and ostensible authority to make the representations previously described; Ross and Grossinger had no actual authority to offer or place fraudulent Jerome stock or make any misrepresentations concerning such transactions but ostensible authority to offer and place such transactions and make the representations already noted; that Kamen did not know and had no reason to know of the fraudulent acts of the agents; that Kamen exercised due care in the selection and supervision of its employees; that Aschkar had knowledge that the type of transactions it was being offered by Ross and Grossinger, i. e., fixed profit transactions in return for listed business, violated the rules of the New York Stock Exchange; that Aschkar's participation in said transactions was neither illegal as to it nor so unusual or shocking as to put Aschkar on notice or require it to investigate the authority of Ross and Grossinger; and that Aschkar was justified in relying on the ostensible authority of Ross and Grossinger to make the previously cited representations and justified in relying on such representations.
 
 
 32
 The existence here of an agency relationship with Kamen as principal and Ross and Grossinger its agents is established beyond doubt. It is also clear that Ross and Grossinger, as agents, had actual authority to solicit listed business in the manner previously described, i. e., the offering of certain special services to nonmember broker-dealers. Finding No. 24 of the trial court states:
 
 
 33
 "The partners of Kamen & Co. did not know, nor did they have reason to know, of the fraudulent means by which Ross and Grossinger were obtaining listed business for Kamen & Co. or suspect that the business was being conducted in an irregular fashion. Kamen & Co. and its partners exercised due care in the selection and supervision of their employees. Except for such conduct which may be imputed to them as a matter of law, neither Kamen & Co. nor any of its partners, directly or indirectly, induced the fraudulent acts of Ross and Grossinger described herein, or had reasonable ground to believe that Ross and Grossinger were committing any such acts." (Transcript of Record, Volume I, at p. 109).
 
 
 34
 We have reviewed the record and are in accord with the above finding.
 
 
 35
 The finding of the trial court that the agents did not have actual authority to offer or place the fraudulent Jerome stock, or to make any misrepresentations concerning the transactions is amply supported by substantial evidence. Therefore, and absent actual authority, Kamen's liability, if any, must be predicated upon the ostensible authority of its agents.[8] The trial court found the existence of ostensible authority and based liability thereon. The validity of this finding presents the principal issue involved in the instant appeal. Unless the finding is "clearly erroneous" we are bound by it.[9]
 
 
 36
 "* * * A finding is `clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 37
 In this diversity action, state law is controlling. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties have assumed the application of California substantive law and we accept this assumption. By statute (Civil Code, Sec. 2315), California gives to an agent "such authority as the principal, actually or ostensibly confers on him." (Emphasis supplied). Ostensible authority is then statutorily defined (Civil Code, Sec. 2317) in this language: "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent possesses." In reference to this section of the California Code, the following observation is found in 2 Cal.Jur.2d, Sec. 49, at page 696:
 
 
 38
 "The elements essential to the application of the doctrine of ostensible authority may be divided into two groups. The first embraces the elements necessary to the existence of ostensible authority. Those are (a) that the third person must believe the agent has authority, and (b) that such belief must be generated by some act or neglect of the person held."
 
 
 39
 Some recent expressions on the question by California Courts are illustrative:
 
 
 40
 "It is settled that ostensible authority arises as a result of conduct of the principal which causes the third party reasonably to believe that the agent possesses the authority to act on the principal's behalf." (Emphasis supplied.) United States Credit Bureau, Inc. v. Cheney, 235 A.C.A. 431, 45 Cal. Rptr. 525, 527 (1965).
 
 
 41
 "The theory of ostensible agency is that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person, the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him. * * *" (Emphasis supplied.) Walsh v. Hooker and Fay, 212 Cal.App.2d 450, 28 Cal.Rptr. 16, 20 (1963).
 
 
 42
 The Restatement of the Law of Agency has been generally endorsed by the California courts.[10]
 
 
 43
 Selected quotations from "Comments" found in Restatement of Agency 2d will serve to point up the obligations of the third party when presented with representations by an agent.
 
 
 44
 "If a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability. Any substantial departure by an agent from the usual methods of conducting business is ordinarily a sufficient warning of lack of authorization." (Emphasis supplied) Sec. 166, Comment a, page 393.
 
 
 45
 "WHERE THIRD PERSON SHOULD KNOW THAT AGENT IS UNAUTHORIZED. A principal is not liable in deceit for unauthorized representations made to a person who has reason to believe that they are not of the sort authorized. If, therefore, the representations are of a sort which, in view of the nature of the agency, the article sold, and the purpose for which it is sold, normally would not be authorized, the other party has no action of deceit against the principal who did not authorize them. Likewise, if the representations are as to a matter concerning which the other party, in view of business customs and other facts which he knows or should know, should realize the agent is not authorized to make statements, the principal is not liable for them." Sec. 258, Comment c, page 562.
 
 
 46
 We have accepted as well established both the proof of agency and authority of Ross and Grossinger to act in the area of soliciting listed business from such over-the-counter dealers as plaintiff. Equally well settled is the fact that no actual authority was granted to such agents to make the untrue statements or proffer the fraudulent transactions herein disclosed.
 
 
 47
 For ostensible authority to exist, Aschkar must have reasonably believed that the agents possessed the authority to make the representations on which plaintiff seeks to hold Kamen.
 
 
 48
 It becomes necessary then to review the evidence from the perspective of Aschkar to measure his conduct in the light of his personal knowledge and experience.
 
 
 49
 The evidence is that Paul H. Aschkar had been engaged in the securities business since approximately 1933. Aschkar had been a registered representative on the New York Stock Exchange from 1950 to 1960, as well as a registered representative of the American Stock Exchange for a like period. He was aware of the fact that both Exchanges had rules prohibiting the giving of rebates, returns, or discounts or allowances in return for listed business, a violation of which could result in disciplinary action against the member by the Exchange. He testified that the type of transactions here involved was not a common practice. In addition, Aschkar, during the period when he was a registered representative of the New York Stock Exchange worked directly under another registered representative who was suspended from the Exchange for offering competing brokers arranged stock transactions at a profit. Aschkar not only described being given both a buyer and a seller as not a common practice but could not recall any specific instance during his carreer in the securities industry where the customer's price was guaranteed. He was personally unacquainted with Kamen and did not know Ross or any other employee of Kamen. The first contact Aschkar had with Kamen was a phone call from Ross (or Grossinger, it is not clear which one) on July 10, 1963, offering him the chance to buy 700 shares of Jerome, telling him from whom to purchase and at what price and to whom to sell and at what price with a guarantee in the name of Kamen that the named purchaser would indeed purchase. He made no checkup to determine the authority of the person making the phone call.
 
 
 50
 The trial court specifically found[11] that the offering of the fixed profit transaction made by Ross and Grossinger to Aschkar violated the rules of the New York Stock Exchange and that this fact was well known to Aschkar. The court further found that the transaction was unusual. Yet the court went on to find, as a part, again, of the same specific finding that these practices were not so unusual or shocking as to put Aschkar on notice or require him to investigate or doubt the extent of the authority of Ross and Grossinger as agent of Kamen. He then found that Aschkar was justified in relying on the ostensible authority of the agents.[12]
 
 
 51
 In this regard we are left with an abiding and firm conviction that a mistake has been made. In the light of the admitted and judicially found facts it cannot be held that Aschkar acted as a reasonably prudent person in concluding, and asserting his belief, that the purported agents were possessed with the ostensible authority to offer to him the transactions and promises which they did. The proposed guaranteed profit sales so far departed from propriety and were patently of a sufficiently unusual nature in the light of Aschkar's knowledge and experience as to put him on warning and require him to take some steps to inquire into the extent of authority of the agent. We are constrained to hold that the finding that the agents had ostensible authority was clearly erroneous. We reverse.
 
 
 52
 Appellant's second contention, i. e., that plaintiff has rights of action against the firms to whom he sold the stock in question, for a sales price in excess of what be paid, and therefore the District Court erred in holding appellants liable for the full purchase price paid by plaintiff for the stock, is made moot by our determination that Kamen is not liable to Aschkar upon agency principles.
 
 
 53
 As noted, Aschkar, on cross-appeal, relies upon three errors. First, it is contended that the trial court erred in failing to conclude that the duties imposed by the Securities Act of 1933 and the Securities and Exchange Act of 1934 on members of national exchanges are non-delegable and that any violation thereof by an employee renders his employer civilly liable to the same extent as if the employer himself had violated the Acts.
 
 
 54
 In support of the above contention, cross-appellant cites several cases where the employer was held liable for the acts of his employee where the particular activity was deemed non-delegable. Such cases may be valid propositions of law but they have no application to actions maintained under the Securities Acts. Aschkar sought relief under the Securities Act of 1933. Section 15 of the Act (15 U.S.C. § 77o), known as the "Controlling Persons" provision and applicable here, predicates liability upon the controlling person, "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." We have already concurred with the trial court in its finding that Kamen was neither a participant, directly or indirectly, in the fraudulent activities of Ross and Grossinger nor did Kamen have any reasonable ground for believing such activities were taking place. Kamen, concededly "a controlling person" is, however, not vicariously liable for the acts of the agent under the provisions of the Securities Act of 1933.
 
 
 55
 Relief was also sought under Sections 10 and 15 of the Securities Act of 1934 (15 U.S.C. §§ 78j and 78o) and rules promulgated thereunder. Like the Securities Act of 1933, the 1934 Act contains a "Controlling Persons" provision, Section 20 (15 U.S.C. § 78t (a)). The test of liability there for the controlling person is that he must have acted in bad faith and directly or indirectly induced the conduct constituting a violation or cause of action. Kamen, as a controlling person, is not liable under this section for reasons already noted.
 
 
 56
 Cross-appellant's second error relied upon is that the standard of care which the trial court imposed on a member firm of the New York Stock Exchange in supervision of its employees was shockingly inadequate. In other words, cross-appellant claims Kamen was negligent in his employment and supervision of the activities of his employees. We find no basis for this contention, the evidence and the trial court's finding is otherwise.
 
 
 57
 Lastly, cross-appellant claims the trial court erred in refusing to admit into evidence a report in affidavit form prepared by an investigator for the Securities and Exchange Commission in the performance of his official duties.[13] It is contended that the affidavit is admissible as an official document pursuant to a statutory obligation of the Securities and Exchange Commission to investigate possible violations of the Acts.[14] The purported purpose of introducing this document into evidence was to prove Kamen had knowledge of the fraud being committed by their employees.
 
 
 58
 We have examined the affidavit with care and find that generally it contained material already available to the court and generally found in the agreed facts set out in the Pre-Trial Order. The principal paragraph of the document on which plaintiff contends for a showing of knowledge on the part of Kamen is set out below.[15] That the proposed evidence is hearsay can hardly be the subject of disagreement. The trial court found it to be hearsay and inadmissible.
 
 
 59
 In support of the claimed error, cross-appellant cites the American Law Institute's Model Code of Evidence, Rule 515[16] and cases from various circuits adopting the rule. This Court's limitation of the rule in Olender v. United States, 210 F.2d 795, 800 (9th Cir. 1954) is acknowledged but cross-appellant asserts that it is no longer controlling in view of the decision in Canada Life Assurance Company v. Houston, 241 F.2d 523 (9th Cir. 1957).
 
 
 60
 In Olender, supra, a criminal prosecution for income tax evasion, we said:
 
 
 61
 "Since the official documents are a substitute for the personal appearance of the official in court, it is generally held that such documents, to be admissible, must concern matters to which the official could testify if he were called to the witness stand. Vanadium Corp. of America v. Fidelity & Deposit Co. of Maryland, 2 Cir., 159 F.2d 105 at p. 109; 5 Wigmore on Evidence, § 1635 (3rd Ed.). Thus, this circuit and most of the other circuits which have passed on the question have held that the facts stated in the document must have been within the personal knowledge and observation of the recording official or his subordinates, and that reports based upon general investigations and upon information gleaned second hand from random sources must be excluded. (Citing cases)".
 
 
 62
 The paragraph here involved falls squarely within the limitation placed on the rule admitting official documents by Olender. Nothing we are able to perceive in Canada, supra, ameliorates the rule of this circuit. The statement sought to be introduced as a portion of the exhibit was clearly hearsay and not within the official document exception to the hearsay rule. Additionally, we are constrained to the view that the proffered evidence fell far short of showing the knowledge of fraud which plaintiff contends. Since the other evidence contained in the exhibit was, as previously noted, already before the Court, the exclusion of the exhibit would at most be harmless error. Harmless error is not ground for reversal.[17]
 
 
 63
 It follows that the errors relied on by the appellee in the cross-appeal are without merit.
 
 
 64
 The judgment of the trial court is reversed and the cause remanded with instructions to dismiss the complaint and enter judgment for the appellant.
 
 
 
 Notes:
 
 
 [1]
 Defendants Ross and Grossinger defaulted to the complaint of Aschkar and judgment was entered against them on November 15, 1964. They have apparently retired to sanctuary in South America
 
 
 [2]
 Stock Exchange rules generally require that stocks listed on a particular exchange may only be purchased by members thereof. In addition, the particular exchange sets the commission rates to be charged and prohibits the member from sharing commissions with non-members. (See for example New York Stock Exchange Constitution and Rules, February 15, 1965, Art. XV, Sections 1 & 8). Broker-dealers who are not members of any national exchange often receive orders for stocks listed on such exchanges. Since the member who executes the order receives the commission on a non-sharing basis, there exists great competition among members to obtain the "listed business" of such broker-dealers
 
 
 [3]
 The "special services" to broker-dealers, which Kamen subsequently provided consisted of free long distance telephone service on listed stock quotations and orders, fast service in obtaining such quotations and orders, free access to the analysis of the stock specialists employed by Carl M. Loeb, Rhoades & Co. and free research material from the various companies
 
 
 [4]
 Jerome Richards & Co., Inc. apparently was an over-the-counter broker-dealer, having little or no assets
 
 
 [5]
 15 U.S.C. § 77a and rules promulgated thereunder
 
 
 [6]
 15 U.S.C. § 78o and 15 U.S.C. § 78j, together with rules promulgated thereunder.
 
 
 [7]
 Certain additional claims and cross-claims were initially plead and other parties involved, however, these claims and interests are not now germane to this appeal
 
 
 [8]
 "Ostensible authority is merely a synonym for apparent authority and is so used by many courts." Restatement of Agency 2d, Sec. 8, Comment (e), page 34
 
 
 [9]
 Rule 52(a), F.R.Civ.P. * * * "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * *"
 
 
 [10]
 Rutherford v. Rideout Bank, 11 Cal.2d 479, 90 P.2d 978, 117 A.L.R. 383
 
 
 [11]
 Finding of Fact No. 35
 
 
 [12]
 Finding of Fact No. 36
 
 
 [13]
 Plaintiff's Exhibit #52, set out at page 142 of the transcript
 
 
 [14]
 15 U.S.C. §§ 78a and 78u
 
 
 [15]
 "Thomas S. Crow, of the broker-dealer firm of Crow, Brourman & Chatkins, Inc. has known Kamen since 1959. In the middle of June 1963 he and Kamen met twice, once in Crow's office in New York and once at Kamen & Co. Crow told Kamen on these two occasions that he had given Kamen & Co. a large amount of business on the exchanges and had not received enough reciprocal over-the-counter business from Kamen & Co. Kamen said that `he would speak to the boys' about it." Vol. I of the transcript, Par. 39, page 154
 
 
 [16]
 "Rule 515. Written Statements by Public Officials
 Subject to Rule 519, evidence of a writing made as a record, report or memorandum of facts and conclusions concerning an act, event or condition, unless specifically privileged from disclosure by a statute requiring it to be made, is admissible as tending to prove the truth of the matter stated therein if the judge finds that
 (a) the writing was made in the performance of the functions of his office by an official of a state or nation or governmental division thereof, acting personally or through his subordinates, and
 (b) it was a function of the official acting personally or through his subordinates
 (i) to do the act, or
 (ii) to observe the act, event or condition, or
 (iii) to investigate the facts concerning the act, event or condition and to make findings or draw conclusions about it."
 
 
 [17]
 28 U.S.C. § 2111