**NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA., Plaintiff,**

v.

**C.P.P. INSURANCE AGENCY, INC., Defendant.**

No. 81 Civ. 4717 (WK).

United States District Court,
S.D. New York.

May 11, 1983.

Report and Recommendation
March 14, 1983.

Bernard Hubscher, New York City, for plaintiff.

Shaw & Stedina by Leon Baer Borstein, New York City, for defendant.

## ORDER GRANTING SUMMARY JUDGMENT AGAINST DEFENDANT C.P.P.

WHITMAN KNAPP, District Judge.

The case is before us on plaintiff's motion for summary judgment and for the appointment of a receiver [docket entry # 13].

At the close of oral argument it appeared that additional determinations were required before we could rule on this motion. Accordingly, we referred the matter to the Hon. Nina Gershon, United States Magistrate, to hear and report on the following two questions: (a) whether there was a material issue of fact as to "defendant's contention that in early 1978 officers of Frank B. Hall & Co. ['Hall'] authorized defendant to withhold [certain] funds"; and (b) if the answer to question (a) were in the affirmative, did "there exist a genuine issue of material fact as to whether Hall had real or apparent authority to give such directive."

The Magistrate has issued her Report and has concluded that, although question (a) above must be answered in the affirmative, the conclusion that Hall had neither real nor apparent authority to direct the diversion of funds is not subject to a material dispute.

 We find the Magistrate's Report to be complete and persuasive. We have also reviewed the affidavit of Phil Meisinger dated March 21, 1983 submitted in objection and conclude that it raises no meritorious issue. We thus approve Magistrate Gershon's Report and hereby adopt it as our opinion.[1]

Accordingly, we GRANT plaintiff's motion for summary judgment. Plaintiff's application for the appointment of a receiver is denied, without prejudice to the renewal of such application if it be properly supported.

SO ORDERED.

## REPORT AND RECOMMENDATION

NINA GERSHON, United States Magistrate:

In a motion for summary judgment and for the appointment of a receiver, the plaintiff insurance company seeks gross insurance premiums of $2,590,143.00 collected during the period March 1980 to February 1981. The defendant does not dispute that it collected the amount at issue or that the amount represents premiums on National Union insurance policies. However, it asserts that it was authorized by the plaintiff's managing agent Frank B. Hall & Co. of California (a third-party defendant in this action) to withhold the funds collected and use them in developing other business. The Honorable Whitman Knapp, District Judge, has referred the matter to me to report on two questions: First, is there a genuine issue of material fact as to the defendant's contention that in early 1978 officers of Frank B. Hall & Co. authorized the defendant to withhold funds collected by it and use them in developing other business? Second, if the answer to that question is "yes", is there a genuine issue of material fact as to whether Hall had real or apparent authority to give such a directive on behalf of the plaintiff? For purposes of these proceedings, Judge Knapp has directed that I assume that the defendant held the funds in question in a fiduciary capacity.

The first question is readily answered in the affirmative. Phil C. Meisinger, president of the defendant, in his affidavits, states unequivocally that Hall through its

[1] In her Report the Magistrate correctly observes that in our Order of Reference we directed that she "assume that the defendant held the funds in question in a fiduciary capacity." In light of the Magistrate's conclusions, which we have adopted, it is immaterial to our grant of summary judgment whether or not defendant was a fiduciary with respect to the diverted funds.

officers Fred Toland and Gary Thompson (third-party defendants in this action) specifically directed the defendant to pay the amounts collected to other parties for the purpose of developing other business (Meisinger Afft., ¶ 9; Meisinger (Suppl'l) Afft., ¶¶ 22, 28, 29, 30, 31). In contrast, Fred Toland and Gary Thompson state unequivocally that they gave no such directions (Toland Afft., ¶ 3; Thompson Afft., ¶ 3). Another officer of Hall, Stephen C. Leonard, has also filed an affidavit stating that he gave no such directions (Leonard (Suppl'l) Afft., ¶ 3). Thus, there is a sharply contested issue of material fact as to whether officers of Hall advised the defendant that it could withhold funds collected on National Union insurance policies and use the funds for developing other business.

However, as to the second question, there is no genuine issue as to the fact that Hall had neither real nor apparent authority to give such directions on behalf of the plaintiff.

The affidavits of Thompson, Toland and Leonard, all vice-presidents of Hall, acknowledge that they did not have the authority claimed by the defendant (Leonard (Suppl'l) Afft., ¶ 6; Toland Afft., ¶ 7; Thompson Afft., ¶ 6). It is the plaintiff's position that not only did Hall have no actual authority but also that Hall had no apparent authority. The defendant's position is that there is a genuine issue of material fact as to both actual and apparent authority.

■ On a motion for summary judgment the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Adickes v. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Court, in considering the motion, "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought". *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). However, the mere recitation

of the pleadings or submission of conclusory allegations is insufficient to defeat summary judgment. *Markowitz v. Republic National Bank of New York,* 651 F.2d 825, 828 (2d Cir.1981); *Dressler v. MV Sandpiper,* 331 F.2d 130, 133 (2d Cir.1964).

The parties agree that the substantive law of California applies to the issue of authority. According to California Civil Code § 2316:

> "Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess."

Section 2317 of the California Civil Code provides that:

> "Ostensible authority [1] is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess."

■ Thus, the existence of either actual or ostensible authority depends on the conduct of the principal. Whether actual authority exists depends on the principal's conduct vis-a-vis the agent. Whether ostensible authority exists depends on the principal's conduct vis-a-vis a third party.

■ Accordingly, for there to be actual authority,

> "It must be shown that [the agent's belief in his authority] was engendered by conduct of the principal. To hold otherwise would give any agent, not the authority, but the naked power to bind his principal to any contract within the general scope of his duties, however fantastic or detrimental to the principal's interest such contract might be."

*South Sacramento Drayage Co. v. Campbell Soup Co.,* 220 Cal.App.2d 851, 34 Cal.Rptr. 137, 140 (Dist.Ct.App., 3rd Dist.1963).

■ Similarly, where there is no proof that any conduct of the principal engendered a third party's belief that an agency relationship extended to the transaction

---

1. "Ostensible authority" is the California term for what has been referred to in this case as "apparent authority".

claimed, the principal will not be bound. *Id.* "[P]ersons dealing with an assumed agent, whether the assumed agency be a general or special one, are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority ..." *Id.,* at pp. 140–141, quoting 1 Mechem, Mechem On Agency, p. 527 (2d ed.). Where circumstances suggest a doubt as to the extent of an agent's authority, an inquiry must be made. *Id.,* at p. 141. Put another way, ostensible authority arises only where the conduct of the principal causes the third party *"reasonably to believe"* that the agent has authority to act in the matter; from the point of view of the third party, the transaction must seem *"regular on its face"*. *Kamen & Co. v. Paul H. Aschkar & Co.,* 382 F.2d 689, 695 (9th Cir.1967), *cert. denied,* 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968), quoting California cases [emphasis by *Kamen* Court]. Thus, in *Kamen & Co.,* the Court of Appeals for the Ninth Circuit held that the plaintiff securities broker-dealer could not recover from a securities dealer whose employees had sold the plaintiff worthless stock where it could not be concluded that the plaintiff had "acted as a reasonably prudent person in concluding, and asserting his belief, that the purported agents were possessed with the ostensible authority to offer to him the transactions and promises which they did". 382 F.2d at 696. Although there was clearly an agency relationship between the defendant and its employees, "The proposed guaranteed profit sales so far departed from propriety and were patently of a sufficiently unusual nature in the light of [the plaintiff's] knowledge and experience as to put him on warning and require him to take some steps to inquire into the extent of authority of the agent". *Id.*

In the case at bar, the parties have submitted voluminous affidavits and documents setting forth their positions as to the relationships between and among the various parties. A detailed review of those affidavits and documents reveals that there is no genuine issue as to the fact that Hall had neither real nor ostensible authority to tell the defendant to withhold the funds and use them for another purpose. Accepting as true for purposes of the motion Meisinger's statement that he believed Hall had actual authority (Meisinger (Suppl'l) Afft., ¶ 33), there is no genuine issue of fact as to whether the plaintiff intentionally conferred the authority claimed on Hall or, by its acts, allowed either Hall or the defendant to reasonably believe that Hall had such authority. If Meisinger believed Hall had such authority, that belief was unreasonable in light not only of the undisputed facts and exhibits offered by the plaintiff but in light of the very facts and documents upon which Meisinger relies.

Before reaching the heart of the dispute, it will be useful to describe generally the undisputed background of the lawsuit. The defendant sells automobile service contracts which it supplies to automobile dealers who, in turn, sell them to their retail customers. The "Consumer Protection Plan", as each contract is called, is an agreement between a dealer and the retail purchaser under which the dealer, for a fee, agrees to make specified repairs for a period after the termination of the manufacturer's warranty. The plaintiff issues insurance policies to the dealers who sell the Plan, to cover losses incurred by the dealers in fulfilling their obligations to customers under the Plan.

Third-Party defendant Hall is the plaintiff's managing agent for this business. While CPP in its papers attempts to minimize its relations with National Union and refers to itself as a mere "collection agent" for Hall, Judge Knapp has specifically directed me to assume for purposes of the motion that the defendant held the funds in question in a fiduciary capacity. Indeed, implicit in CPP's defense that it acted as it did on the understanding that Hall was authorized by National Union is the recognition that it could not properly have so acted unless there was such authority. And the undisputed facts appearing on this motion establish that the defendant was well aware that the premiums it was collecting at the behest of Hall were National Union's. Thus, CPP does not deny the purport

of the various exhibits establishing the simultaneous nature of the arrangement in which automobile dealers both obtained Consumer Protection Plan contracts from CPP to sell to their retail customers and purchased National Union insurance policies to cover any losses incurred as the result of those contracts. The CPP brochure states that "The Consumer Protection Plan is underwritten by National Union . . ." (Ex. 20 to Hubscher Reply Aff'n). And, as stated by Meisinger (Meisinger (Suppl'l) Afft., ¶ 5):

> "Since the program commenced, and as conceived by all concerned, CPP recruited and trained individuals and organizations to act as sales representatives in the sale of said Plans and, in addition, to act as agents for National Union in obtaining this insurance for dealers."

The terms of the agency relationship between Hall and the plaintiff are set forth in a Managing Agency Agreement which both the plaintiff and the defendant have submitted on this motion (Ex. 22 to Hubscher Aff'n in Supp. of Mot. for Sum. Judg.; Ex. A to Meisinger Afft.). Meisinger acknowledges that he had a copy of and was familiar with this Agreement. The pertinent portions of the Agreement are as follows: Article I appoints Hall, subject to the terms, conditions and restrictions set forth in the Agreement, as National Union's managing agent for the production, servicing and acceptance of certain insurance. Article III gives Hall the authority "to do all things necessary in the usual and proper conduct" of the businesses specified which include "to collect premiums; [and] guarantee the payment of all earned premiums to [National Union]". Article IV directs Hall to "use its best efforts to serve [National Union] faithfully" and to safeguard National Union's best interests. Article V authorizes the Managing Agent to request that National Union appoint specified agents and provides that, subject to National Un-

ion's right to reject such appointments, National Union will appoint them. Article VIII(A) provides that Hall shall within a specified time render statements as to premium transactions and Article VIII (B) provides that:

> "All premiums received by the Managing Agent on behalf of the Company [National Union] shall be deposited by the Managing Agent in a premium account for the Company. The Managing Agent shall remit the balance due to the Company within thirty days after the close of each month . . . ."

Finally, Article XI provides that "No act by either party hereto shall be construed to be a waiver or modification of any of the terms hereof, unless in writing and duly subscribed".

There is no dispute as to the meaning of this Agreement, which neither in specific nor general terms authorizes Hall to direct or permit the defendant to withhold National Union's premiums and use them for other purposes. Although CPP argues in a conclusory fashion that the documents submitted, including the Agreement, support its position, CPP in fact points to nothing in the Agreement or in the other documents submitted which states, or even suggests in any way, that Hall has such authority.

An examination of the documents which CPP particularly relies upon points up how imaginary is its assertion that Hall has the authority claimed. Exhibit C to Meisinger's (Supplemental) Affidavit is a letter from a vice president of an affiliate of National Union to Hall, and an attached worksheet, which, as CPP describes it in its (Supplemental) Memorandum, at page 5, shows how the flow of funds was to work, namely, from CPP to Hall, to National Union, then to National Union's reinsurers. According to CPP, "this exhibit undoubtedly demonstrates the deep involvement of Hall in the expenditure of funds". Deft's (Suppl'l) Memo, p. 5.[2] But even accepting this state-

---

**2.** CPP also argues that, since Toland and Thompson, officers of Hall, had connections to one of the National Union's reinsurers, "Hall's authority to determine how funds should be

expended cannot be questioned". Deft's (Suppl'l) Memo, pp. 5–6. Even apart from the plaintiff's dispute as to the facts on this issue (the plaintiff's position is that Meisinger was

ment, it fails to establish any factual issue as to the matter at bar, namely Hall's authority, actual or ostensible, to direct CPP to withhold National Union's premiums and use them for its own purposes. By showing the understanding of the parties that National Union's premiums were to flow from CPP through Hall to National Union, it, if anything, confirms that CPP was to remit the premiums; no indication whatever is given in the exhibit that Hall had the authority to interrupt the flow by directing CPP to withhold the premiums.

Similarly, the statement of Mr. Smetana, president of plaintiff's risk management company, to CPP, that "On an ongoing basis, you will work out some arrangement with Hall ...", does not, as CPP argues, constitute advice to CPP that Hall had the authority claimed, but rather is a clear indication from a representative of the plaintiff to CPP that no such authority was given (Ex. 10 to Toland Afft.; Ex. 25 to Hubscher Aff'n in Supp. of Mot. for Sum. Judg.). The full text of the letter is set forth below:

> "This is to confirm our agreements of last week concerning the outstanding balances on the above account.
>
> 1. You will provide us with approximately $600,000 of remittances prior to the end of December.
>
> 2. During the course of the month of January, you will remit all premiums due so that the account is within 90 days as respects receivables.
>
> 3. *On an ongoing basis, you will work out some arrangement with Frank B. Hall* to insure that the account does not fall into the serious arrears that exists at the present time.
>
> I appreciate your candor and efforts in working out a mutually agreeable solution to the problem on this account. We certainly are not interested in terminating; however, must maintain financial integrity. I look forward to receiving the various premiums."

[Emphasis on sole portion of letter quoted and relied upon by the defendant.]

Thus, the letter confirms agreements to get CPP out of the arrears which are at issue here and provides that certain remittances be made. It clearly indicates National Union's demand for the premiums and thus the lack of authority in Hall to sanction CPP to withhold them. Clearly, "the arrangement" spoken of in the letter, to assure that the account not be in arrears, is an arrangement to assure that CPP remit the premiums. CPP's perverse and baseless attempt to read this letter as establishing the exact contrary is rejected.

Finally, the reasonableness of Meisinger's belief in Hall's authority must be measured against the nature of the authority claimed. CPP is a company regularly doing business with insurance companies and does not and could not claim lack of sophistication or knowledge in the area. The authority that CPP claims Hall had was the extraordinary authority to direct CPP to withhold over $2.5 million of premiums and use the money for other business purposes. Moreover, it is undisputed that the other business purposes were the development of two programs which had been offered to the plaintiff and which the plaintiff had specifically rejected. As stated by Meisinger, CPP developed a "package" consisting of two programs for sale to dealers in addition to the Consumer Protection Plan. The two additional programs were a "Credit Life Insurance" program under which the automobile loan would be paid if the debtor died and the "Loanpower" program which would insure the lender against a default on the automobile loan. Meisinger (Suppl'l) Afft., ¶¶ 16–18. Meisinger spends considerable time in his papers praising CPP's efforts to develop the two additional programs and make them part of the package, which he states would have been good for National Union's

---

principal owner of that reinsurance company and that if Meisinger made Hall officers shareholders of the company, it was without the knowledge or consent of the plaintiff (Hubscher Rep. Aff'n in Supp. of Mot. for Sum. Judg.,

pp. 4–5)), CPP fails utterly to explain how that relationship gave Hall authority to direct CPP to withhold over $2.5 million of premiums due National Union.

profits as well as Hall's and his own.[3] He acknowledges, however, that National Union refused to participate in either program, each of which, of course, had to be underwritten by an insurance company. *Id.,* at ¶¶ 18, 20; Exs. 2, 3, 12 to Hubscher Aff'n in Supp. of Mot. for Sum. Judg. Thereafter, CPP continued its "development" of these programs by seeking other underwriters. It was for "development" of these programs, which National Union refused to participate in, that CPP used the withheld National Union premiums. Meisinger Afft., ¶ 9. *See* Hubscher Aff'n in Supp. of Mot. for Sum. Judg., Exs. 5 *et seq.,* for a description of CPP involvement with other insurance companies on the Loanpower program. On the undisputed facts, CPP simply could not have reasonably believed that Hall had the authority to tell CPP to use funds owing to National Union, which CPP knew had specifically rejected any involvement in the Credit Life Insurance or Loanpower programs, to finance the development of those programs with other insurance companies. *See Kamen & Co. v. Paul H. Aschkar & Co., supra.* Here, as in that case, the alleged directions relied upon by Hall "so far departed from propriety and were patently of a sufficiently unusual nature in the light of [CPP's] knowledge and experience as to put [it] on warning and require [it] to take some steps to inquire into the extent of authority of the agent". *Id.,* 382 F.2d at 696. No such inquiry was made.

Meisinger states that "Toland and Thompson assured me, throughout the period of time at issue, that they would 'take care' of National Union and for CPP to not worry about paying or not paying National Union. Hall said, 'Let us handle it.'" Meisinger (Suppl'l) Afft., ¶ 30. Even apart from the principle that it is the conduct and statements of National Union, not that of Hall, which govern, the statements attributed to Hall, if anything, suggest CPP's awareness of a problem and the error of its failure to make inquiry of National Union.

CPP's claim that National Union "acquiesced" in its withholding of the premiums has no factual support. Meisinger states that CPP was often late by six or eight months in paying Hall and that National Union never complained to CPP about the delay, nor about any of the advice or direction given CPP by Hall. Meisinger (Suppl'l) Afft., ¶ 23. That Hall had some authority to make arrangements to deal with delays in payment and National Union did not complain to CPP about the delays described hardly suggests that Hall had the authority to sanction CPP's deliberate withholding of $2.5 million in premiums and use of them for other business purposes. Nor does the absence of a complaint to CPP about Hall's advice or directions to CPP raise a factual issue as to such authority in the absence (here total) of any indication that National Union was aware that Hall was giving the advice and directions now asserted by CPP.

Finally, Meisinger argues that "Because of the complexity of the issues, the involvement of Hall and the magnitude of authority exercised by Hall, with the knowledge of National Union, I believe that I will be able, through discovery, to prove that Hall had actual authority from National Union to direct CPP as it did". *Id.,* at ¶ 34. These conclusory statements are insufficient to defeat summary judgment. Although Meisinger refers to "the magnitude of the authority exercised by Hall, with the knowledge of National Union," he fails to suggest any statement or conduct by National Union upon which either he or Hall could have reasonably relied in assuming that Hall has the extraordinary power he claims National Union gave to Hall. If in fact officers of Hall made the statements that Meisinger attributes to them, all he has shown is that the defendant and Hall were involved in a scheme to deprive the plaintiff of moneys which admittedly they were under an obligation to remit.

The suggestion that discovery might alter this factual picture is without merit. Meisinger knows now everything he relied upon

---

**3.** The supposed benefit to National Union is disputed by National Union.

in concluding that National Union authorized Hall as he claims it did. He has acknowledged familiarity with the Managing Agency Agreement setting forth the terms of the Agency between National Union and Hall and he has suggested nothing that he needs to obtain which would support his claims.

In sum, I find that while a genuine issue of material fact exists as to whether officers of Hall directed the defendant to withhold funds collected by it and use them in developing other business, there is no genuine issue as to the fact that Hall had neither real nor apparent authority to give such directions on behalf of the plaintiff.[4]

Copies of this report and recommendation are today being mailed to counsel, who are hereby advised that any comments on or objections to the report may be served and filed with the District Court, with a copy to me, within 10 days.

4. In addition to the issue of authority, CPP in its supplemental papers attempts to raise another factual issue by claiming that its total remittances to Hall since 1977 were sufficient to satisfy Hall's guaranteed obligations to National Union. Afft. of Richard Etter attached to Meisinger (Suppl'l) Afft.; Deft's (Suppl'l) Memo, p. 12. Apart from the untimeliness of this attempt, that CPP's gross remittances to Hall over three years may be sufficient to cover Hall's guaranteed obligations to National Union does not raise any dispute as to whether CPP paid over the $2.5 million in gross premiums it collected from March 1980 to February 1981.